# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-03-00359-CR

**William Maynard, Appellant**

**v.**

**The State of Texas, Appellee**

### FROM THE DISTRICT COURT OF TRAVIS COUNTY, 390TH JUDICIAL DISTRICT NO. 2021268, HONORABLE FRANK MALONEY, JUDGE PRESIDING

## O P I N I O N

Appellant William Maynard was convicted by a jury of conspiracy to commit murder, enhanced to a first-degree felony, and was sentenced to seventy-five years' imprisonment. *See* Tex. Pen. Code Ann. § 15.02 (West 2003). He asserts in four issues that: the evidence is factually insufficient to prove his guilt; the evidence is insufficient to corroborate the accomplice witnesses' testimony; the trial court erred in allowing hearsay as corroborating evidence; and the trial court erred in refusing to grant a new trial. We affirm the conviction.

### Factual Summary

Austin Police Officer Roland Ramirez testified that on April 1, 2002, he responded to a report of gunshots at an apartment complex. Ramirez found Matthew Paulk hiding between a balcony and some bushes, blood on his face and neck and a gunshot wound on his neck. Paulk told

Ramirez that he was walking through the complex when he heard gunshots and felt something hit his neck.  Paulk said he was at the apartments to visit a friend, but did not know where the friend lived and could not remember the friend's name.  Ramirez also spoke to Paulk's girlfriend, Michelle Jenkins, who did not offer any explanation of what Paulk was doing at the complex.  Other police officers located the gun used to shoot Paulk and six spent shell casings and also found another gun in bushes near where Paulk hid from his assailant.

Paulk, who at the time of trial was in federal custody on charges related to this incident, testified that on the weekend in question, he drove from Houston with Jenkins and an "associate" named Jamie Loveall.  Paulk had known appellant for about four months and testified that he, Loveall, and appellant were members of the Aryan Brotherhood.  Paulk was a sergeant, Loveall was a captain, and appellant was the general of the Houston/Austin area.

Paulk brought with him from Houston a backpack containing an Uzi, a TEC-9, a nine-millimeter handgun and about a gram of methamphetamine.  Paulk and his companions drove to appellant's brother's apartment, where they met up with appellant, his brother, and a woman named Kimmie.  Through the course of the evening, several other people came to the apartment, and Paulk and many of the others present used drugs and passed the guns around.  Paulk testified that while at the apartment, he and appellant talked about "doing away with a guy named TC," who appellant and Loveall wanted killed because he "was an ex gang member" and "supposedly shot at [appellant] a couple days before."  Appellant told Paulk that Freddie Osmer, another man present at the apartment that night, was supposed to kill TC, but said that if Osmer failed, Paulk was to kill both TC and Osmer.  Paulk testified that, having been given orders by appellant, he believed he would be killed if he did not comply.  Appellant told Paulk to watch out for Osmer, who might double-cross Paulk.

2

At about 11:00 p.m., Paulk, Jenkins, Osmer, and one other man left the apartment; appellant stayed behind. Paulk brought with him the TEC-9 and the handgun; he left the Uzi behind in the apartment but took the ammunition magazine with him and hid it in Jenkins's bag. Paulk and Osmer drove to TC's apartment complex. Osmer called TC, claiming to want to do a drug deal. Paulk testified that he gave Osmer the pistol as they got out of the car. Osmer and Paulk walked into the complex, Paulk carrying the TEC-9 in his backpack and Osmer carrying the handgun under his jacket. As they walked through the complex, Paulk was shot, but he did not know where the shot came from or who shot him. Paulk put the gun in the bushes and hid between some cars. Paulk said that Osmer ran when the shots were fired and that he has not seen Osmer since.

Paulk testified that when questioned by the police, "I knew that my life was in jeopardy because I didn't know who was coming after me to get me, so I wanted to go under the witness protection program and I would cooperate with the cops, and I told them exactly the whole story of what went on." At the time of trial, Paulk was in custody for charges related to being a felon in possession of firearms and had not been charged with conspiracy. He hoped he would be charged in the federal system rather than the state system. Appellant introduced into evidence an agreement that Paulk's testimony against appellant would not be used against Paulk but that he could be charged based on evidence gained independent of his testimony.

Michelle Jenkins[1] testified that when she came to Austin with Paulk and Loveall, she knew Paulk had several guns with him. At the apartment, Jenkins overheard appellant, Paulk, and Osmer planning how they would shoot TC. The men agreed that Osmer would call TC to meet them

---

[1] At the time of the shooting, Jenkins was Paulk's girlfriend. By the time of trial, Jenkins and Paulk had married and apparently divorced. For clarity, we will refer to her by her maiden name.

and then shoot TC. If Osmer did not shoot TC, Paulk was to shoot both Osmer and TC. After she heard this, Jenkins asked Paulk not to go, but when he insisted, she drove him to meet Osmer. Jenkins testified that appellant told her that he could not imagine how it felt to see her fiancé go and not know if he was coming back. Jenkins initially lied to the police, but decided to tell the truth when she learned that Paulk was telling the police the whole story.

Osmer testified that at the time of the shooting he was a member of the Aryan Brotherhood. He and a woman named Rikki Williams went to appellant's brother's house, where they saw several people, including Paulk, Jenkins, and Loveall. Osmer testified that appellant and TC had been feuding, and said that appellant told him that TC was "ex'ed," and that Osmer and Paulk were to "go take care of it." Osmer testified that being "ex'ed" meant "they got to die." Appellant told Osmer and Paulk to find TC and said he "didn't care who did it just as long as it got done." Osmer believed that if he did not kill TC, he himself would be killed. Osmer testified that Loveall gave him a pistol that he put in his jacket pocket before leaving the apartment. Williams drove Osmer to his girlfriend's house, where he borrowed a car. At some point after leaving the apartment with Williams, Osmer called to warn TC and to tell him to get him and his family out of the apartment. He returned to appellant's brother's apartment, where he called TC again, this time in front of appellant, to make the others believe that he was going along with the plan. Osmer and Paulk went to TC's apartment complex. After Paulk was shot, Osmer ran off, throwing the gun away as he went. Osmer admitted that he initially lied to the police, saying that his story had "evolved" over time because he realized he "was made a fool and that, you know, only the truth prevails." At the time of trial, Osmer was under indictment for conspiracy to commit murder.

4

Rikki Williams testified that on the evening of April 1, she went out with Osmer, planning to buy drugs from him. They went to an apartment belonging to appellant's brother. When they arrived, Osmer went to a back room with appellant and Paulk for about fifteen or twenty minutes. Williams testified that she was at the apartment for a couple of hours and that she saw several guns out on a table while she was there. At Osmer's request, Williams drove him to his girlfriend's house and dropped him off. Williams testified that during the drive, Osmer told her he had to go to his girlfriend's house to borrow a car and that he had been told by appellant to kill TC. Osmer was upset and said that TC was a friend of his who had two children, but he said that if he did not kill TC, his own life would be in danger. Williams testified that she did not see Osmer in possession of a gun and that he was wearing only jeans and a tanktop. Williams said she initially did not tell the police about Osmer's statements because she feared it would incriminate her.

Frank Maynard, appellant's brother, testified for the defense. He stated that on the night in question, he heard that Osmer had stolen items from TC's car, including an expensive stereo, wheel rims, and seats. TC called and spoke to appellant, who instructed Osmer to return the stolen items to TC. Maynard heard Osmer say he would "take care of TC." Maynard testified that he had never trusted Osmer and in fact kept a small pistol with him that night because Osmer "always had a gun on him." Maynard testified that he did not hear his brother order a "hit" on TC. Maynard testified that during the course of the evening, people used drugs and handled several guns, some brought from Houston by Paulk. Maynard disputed some of the details given by Williams and testified that she was in the apartment for one hour at the most.

Appellant testified that he joined the Aryan Brotherhood for protection while in prison. Appellant said that he only had authority in Houston, not in Austin. He testified that he was

5

not surprised that Paulk, Loveall, and Osmer brought guns with them because they carried guns wherever they went. Appellant testified that he did not trust Osmer and at the time of the shooting had started "disassociating" himself from Osmer. Appellant testified that he had been friends with TC, but that TC's "mental capacity started deteriorating rapidly" around the time of this incident. Appellant said TC was angry because he believed Osmer had stolen items from his car. Appellant told Osmer to clean up the situation and warned Osmer he might be disciplined for it later. Appellant also testified that Loveall and Paulk were angry at TC about an earlier incident, but that he tried to calm them down. Appellant told Loveall, Osmer, and Paulk that they were not to act against TC, who was an Austin member under another person's authority. Appellant testified that he did not tell the other men that TC was to be excommunicated or killed. Appellant testified that being "excommunicated" meant being stripped of one's membership in the Brotherhood; it did not mean that the person was to be killed. Appellant stated that a "hit" could be anything from "being chastised" to being killed. Appellant denied ordering Osmer or Paulk to kill or hurt TC.

Austin Police Detective William Thompson testified that he interviewed appellant, who said he was a general on the steering committee of the Aryan Brotherhood. Appellant knew TC and told Thompson that TC had recently shot at a car in which appellant was sitting and may have shot at appellant's house. Thompson asked appellant whether he ordered Paulk to kill anyone, and appellant said he had not. He also told Thompson, "I am not going to sit around and let a man shoot at me," and said "a hit was automatic" and did not have to be ordered. Appellant told Thompson that TC was a "bad apple" and that "someone will get him." Asked directly whether he had ordered TC to be killed, appellant said no and then added that "if he causes problems like that, then it is automatic. If I shoot up your house or shoot up your car, what are you going to do. I mean it is a

6

given. Orders are not like that." Thompson testified that "[i]t sounded like there was an internal power struggle going on" involving TC and that appellant believed that if "TC weren't around, those problems would go away." Thompson said being "ex'ed" can mean a number of things, ranging from being asked to leave the group, to being beaten, to being killed.[2]

### Corroboration of Accomplice Witness Testimony

Appellant's first three issues essentially attack the sufficiency of the evidence, arguing that Williams should have been considered an accomplice as a matter of law, that her testimony about Osmer's statement to her was hearsay and improperly admitted, and that the testimony by the accomplice witnesses was not properly corroborated and thus cannot support a guilty verdict. We will consider these three issues together.

An accomplice is one who participates with the defendant before, during, or after the commission of a crime by doing some affirmative act promoting the commission of that offense, *McFarland v. State*, 928 S.W.2d 482, 514 (Tex. Crim. App. 1996), and who could be prosecuted for the same offense, or a lesser included offense, as the defendant. *Blake v. State*, 971 S.W.2d 451, 454-55 (Tex. Crim. App. 1998). In other words, "a person is an accomplice if there is sufficient evidence connecting them to the criminal offense as a blameworthy participant." *Id.* Some witnesses are accomplices as a matter of law and others are accomplices as a matter of fact. *Id.* If

---

[2] From the evidence, it seems likely that TC shot Paulk, but this was not proved at trial.

the evidence as to a witness's status as an accomplice is conflicting, the jury should determine the witness's status under instructions defining an "accomplice."[3] *Id.*

The code of criminal procedure provides that a conviction may not rest upon an accomplice's testimony unless the testimony is "corroborated by other evidence tending to connect the defendant with the offense." Tex. Code Crim. Proc. Ann. art. 38.14 (West 2005) (the "accomplice-witness rule"); *Cathey v. State*, 992 S.W.2d 460, 462 (Tex. Crim. App. 1999). To weigh the sufficiency of corroborative evidence, we eliminate from consideration the accomplice witness testimony and then examine the remaining testimony and evidence to ascertain if there is evidence which tends to connect the accused with the commission of the offense. *Hernandez v. State*, 939 S.W.2d 173, 176 (Tex. Crim. App. 1997). Non-accomplice evidence need not be strong enough to establish the defendant's guilt beyond a reasonable doubt, nor must it directly link the defendant to the commission of the offense. *Id.* However, evidence that merely proves that the offense was committed does not suffice. *Cathey*, 992 S.W.2d at 462. The accomplice-witness rule is met if there is *some* non-accomplice evidence tending to connect the defendant to the commission of the offense. *Hernandez*, 939 S.W.2d at 176. Only in-court accomplice testimony is subject to the article 38.14 requirement of corroboration. *Bingham v. State*, 913 S.W.2d 208, 211 (Tex. Crim. App. 1995) (op. on reh'g).

---

[3] Appellant states in his brief that the trial court instructed the jury that Williams was an accomplice as a matter of law. However, in its jury charge, the trial court explained that Jenkins, Paulk, and Osmer were accomplices as a matter of law and instructed the jury that a conviction could not be based on uncorroborated accomplice testimony and that accomplices could not corroborate each other. The court charged the jury to determine whether Williams was an accomplice. The jury was instructed that, if Williams was determined to be an accomplice, the jury could not convict appellant based on her testimony without corroborating evidence.

The State argues that the statement by Osmer to Williams was admissible both as a non-hearsay statement made in furtherance of the conspiracy, Tex. R. Evid. 801(e)(2)(E), and as a statement against interest allowing its admittance as a hearsay exception.[4] Tex. R. Evid. 803(24). Appellant asserts that Williams should be considered an accomplice as a matter of law.

Williams accompanied her friend Osmer to Frank Maynard's apartment in order to buy drugs. She was not a member of the Aryan Brotherhood and did not know most of the people present, although she had met appellant about a week earlier. She was not part of the conversations between appellant and the other men and her only awareness of the contemplated crime came when Osmer told her why he needed to get a car from his girlfriend's house.

Williams might be considered somewhat blameworthy because she was informed of Osmer's orders and did not report it to the police and because after being told of the planned killing, she drove Osmer to his girlfriend's house so he could get a car. However, she did not participate in any of the planning; she and Osmer had already left Frank Maynard's apartment in her car when he made his statement, and she did not believe he would go through with his orders because he was so upset by the prospect of killing a friend. It is not clear that as a matter of law Williams was *not* an accomplice, but neither is it clear that she was an accomplice as a matter of law. *See Blake*, 971 S.W.2d at 454-55; *McFarland*, 928 S.W.2d at 514 ("be an accomplice as a matter of law, the witness must be susceptible to prosecution for the offense with which the accused is charged"). The trial court did not err in charging the jury with the responsibility of determining whether Williams was

---

[4] Hearsay may be admitted if it "at the time of its making . . . so far tended to subject the declarant to civil or criminal liability, . . . that a reasonable person in declarant's position would not have made the statement unless believing it to be true." Tex. R. Evid. 803(24).

an accomplice as a matter of fact, and we cannot hold that it would have been error for the jury to determine that she was not an accomplice. *See Blake*, 971 S.W.2d at 454-55.

Having held that Williams was not an accomplice as a matter of law and that the jury could reasonably have found that she was not an accomplice as a matter of fact, we turn to whether her testimony relating Osmer's out-of-court statement was admissible. We review a trial court's decision on the admission or exclusion of evidence under an abuse of discretion standard and will not reverse a ruling that falls within a "zone of reasonable disagreement." *Green v. State*, 934 S.W.2d 92, 101-02 (Tex. Crim. App. 1996); *see Paredes v. State*, 129 S.W.3d 530, 534-35 (Tex. Crim. App. 2004) (holding that trial court's decision to allow testimony as adoptive admission under rule 801(e)(2)(B) was within zone of reasonable disagreement).

The State posits two bases for the admission of Osmer's statement to Williams—that it is admissible as a co-conspirator's statement made in furtherance of the conspiracy and, therefore, is not hearsay, or as an exception to the hearsay rule as a statement against Osmer's penal interest. An out-of-court statement is not hearsay if it is made by a co-conspirator of the defendant during the course and in furtherance of the conspiracy. Tex. R. Evid. 801(e)(2)(E); *see Guidry v. State*, 9 S.W.3d 133, 148 (Tex. Crim. App. 1999). To come within this rule, the State must show that a conspiracy existed, that the co-conspirator was a member of or participated in the conspiracy, and that the statement was made to advance or facilitate the conspiracy; it is not enough that the statement was made merely in the course of or was somehow related to the conspiracy. *Guidry*, 9 S.W.3d at 148. Statements made in furtherance of a conspiracy include attempts to induce others to cooperate with or assist co-conspirators; attempts to induce another to join or continue with the

10

conspiracy; discussions related to concealment of the conspiracy; or conversations to identify the roles of the conspirators. *Fairow v. State*, 920 S.W.2d 357, 362 (Tex. App.—Houston [1st Dist.] 1996), *aff'd*, 943 S.W.2d 895 (Tex. Crim. App. 1997). Casual admissions of guilt to someone the declarant individually decided to trust, narrative descriptions, mere conversations between conspirators, or boasting by co-conspirators do not advance a conspiracy. *Id.*

The second ground argued for the admission of the statement is as an exception to the hearsay rule because it was sufficiently against Osmer's penal interest to be reliable. An out-of-court statement that is hearsay may be admissible under an exception to the hearsay rule if at the time it was made it so tended to subject the declarant to criminal liability that a reasonable person in the declarant's position would not have made the statement unless he believed it was true. Tex. R. Evid. 803(24). Courts have held that statements exposing a co-conspirator to "potentially equal criminal liability" but delineating each party's role such that the declarant might "be in a better bargaining position" or "have a better chance at gaining sympathy from the jury" are not admissible against the co-conspirator. *Guidry*, 9 S.W.3d at 149. In other words, rule 803(24) does not allow the admission of a declarant's statement that is against someone else's interest unless it is also sufficiently against the declarant's interest to be reliable. *Id.*

Osmer made his statement to Williams as she was driving him to his girlfriend's house. The State asked Williams if Osmer told her why he had to go to his girlfriend's house. Appellant objected, saying, "I object on the grounds of hearsay." The State responded that it was a statement by a co-conspirator in furtherance of the conspiracy. The trial court admitted the statement, and appellant did not object or argue further. Williams then testified that Osmer told her

11

that "he was ordered by [appellant] to go kill TC and that he had to borrow a car from his girlfriend or her roommate." The testimony reveals that Williams apparently did not know where Osmer needed to go when he got into her vehicle; it was only during the ride from Frank Maynard's apartment that Osmer revealed that he had to go to his girlfriend's house to get a car for the purposes of the conspiracy.

Osmer's statement to Williams was made to explain why she had to drive him to his girlfriend's house to get a car. He needed the car in order to comply with appellant's orders. Therefore, we hold the trial court's determination that Osmer's statement was made in furtherance of the conspiracy fell within the zone of reasonable disagreement and was not an abuse of discretion. *See id*. at 148 (statement is made in furtherance of conspiracy if it advances or facilitates conspiracy); *Fairow*, 920 S.W.2d at 362 (attempt to induce another to assist co-conspirator is statement made in furtherance of conspiracy). Further, even if we were to hold that the statement was not in furtherance of the conspiracy, the statement would be allowable as a statement against penal interest. Osmer told Williams that he had been ordered to kill TC, with the threat that he would be killed if he did not follow through on the order. Osmer did not want to carry out the order and attempted to warn TC, but he also got a car, picked up Paulk, and drove to TC's apartment, armed with a gun. Osmer, although reluctant, was apparently taking steps to carry out his orders. Therefore, his statement to Williams would tend to expose him to criminal charges for conspiracy to commit murder at a minimum. Indeed, at the time of appellant's trial, Osmer was under indictment for that very offense. Even if Osmer's statement was not in furtherance of the conspiracy, it was a statement sufficiently against his penal interest to be admissible under rule 803(24), *see Guidry*, 9 S.W.3d at 149

12

(statements that defendant was triggerman and declarant was only driver were not sufficiently against declarant's interests and were inadmissible under exception); *Dewberry v. State*, 4 S.W.3d 735, 749-51 (Tex. Crim. App. 1999) (statements that "we" or "they" killed someone sufficiently incriminated declarant and were admissible), and the circumstances under which it was made sufficiently indicate that the statement was reliable. *See Guidry*, 9 S.W.3d at 150. The trial court did not abuse its discretion in admitting Williams's testimony about Osmer's statement.

Williams's testimony that Osmer told her appellant had ordered him to kill TC had sufficient indicia of reliability and was properly admitted into evidence. That statement is not accomplice "testimony" subject to the corroboration requirements of article 38.14. *Bingham*, 913 S.W.2d at 211. Therefore, the statement did not require independent corroboration before the jury could rely on it to convict appellant. *Id*. at 213. With this in mind, we now determine whether the testimony by the accomplice witnesses was corroborated and whether the evidence was legally and factually sufficient to support the jury's verdict.

Disregarding the testimony of the accomplice witnesses and reviewing the remaining evidence, we hold that Osmer's statement to Williams about his orders may be used to corroborate the other accomplice witnesses' testimony, *see id.*,[5] and amounts to *some* evidence that tends to

---

[5] Prior to *Bingham v. State*, a defendant's participation in a conspiracy had to be shown by evidence other than co-conspirator testimony or unsupported co-conspirator declarations made in the defendant's absence, nor could one co-conspirator corroborate another. *Chapman v. State*, 470 S.W.2d 656, 662 (Tex. Crim. App. 1971); *see also Beathard v. State*, 767 S.W.2d 423, 429 (Tex. Crim. App. 1989) ("a prior consistent statement made by that same witness fails to provide the additional degree of reliability that corroboration by *independent* evidence would provide and that Art. 38.14 requires"); *Reynolds v. State*, 489 S.W.2d 866, 872 (Tex. Crim. App. 1972); *Brown v. State*, 320 S.W.2d 845, 847 (Tex. Crim. App. 1959).

connect appellant with the offense. *Hernandez*, 939 S.W.2d at 176. Thus, Osmer's out-of-court statement corroborates Paulk's and Jenkins's accomplice testimony, and the jury could have considered that evidence in making its determination of guilt.[6] Tex. Code Crim. Proc. Ann. art. 38.14; *Cathey*, 992 S.W.2d at 462.

---

*Bingham* involved a situation similar to the case at hand. 913 S.W.2d 208 (Tex. Crim. App. 1995) (op. on reh'g). The defendant was accused of committing arson, along with his wife, Tammy Bingham, and his sister-in-law, Peggy McCallum. 833 S.W.2d 538, 540 (Tex. App.—Dallas 1992), *rev'd*, 913 S.W.2d 208. McCallum testified at trial, but Tammy Bingham refused to testify. *Id*. at 540-41. Two other witnesses testified that Tammy Bingham made statements implicating herself and the defendant in the fire. *Id*. The court of appeals held that one co-conspirator could not corroborate another and that third-party testimony about an accomplice's statements could not corroborate the accomplice's testimony, concluding that the trial court erred in failing to instruct the jury on the accomplice witness rule and that accomplices may not corroborate one another. *Id*. at 542, 544. The court of criminal appeals reversed, analyzing article 38.14. 913 S.W.2d at 210-13. The court held that only in-court testimony by an accomplice must be corroborated, basing that decision in part on the danger that an accomplice might fabricate his or her in-court testimony, motivated by a "supposed promise or expectation of conditional clemency." *Id*. at 211 (quoting 7 Wigmore, Evidence § 2057 (Chadbourn rev. 1978), at 417). Out-of-court statements, although still "objectionable unless made under circumstances sufficiently indicative of reliability," do not involve the same hopes of clemency and therefore do not carry the same risks. *Id*. The court concluded:

> the court of appeals was mistaken to conclude that the trial court should have given an instruction to the jury that Tammy Bingham's out-of-court statement must be corroborated before the jury could rely on it for conviction. By the same token, the court of appeals erred to hold that the trial court should have instructed the jury that accomplice witnesses cannot corroborate one another. Because Tammy Bingham did not give "testimony" within the meaning of Article 38.14, it was *not* necessary for the jury "to scrutinize [her] out-of-court statements with the same suspicion as a testifying accomplice."

*Id*. at 213. Our case differs in that Osmer testified at trial, while Tammy Bingham did not.

[6] To avoid the corroboration of Osmer's in-court testimony by his out-of-court statement to Williams, *see McDuff v. State*, 939 S.W.2d 607, 612 (Tex. Crim. App. 1997) ("hearsay from an accomplice cannot corroborate the accomplice's trial testimony, i.e., an accomplice cannot corroborate himself by his own statements made to third persons"), we will disregard Osmer's testimony in evaluating the sufficiency of the evidence.

Appellant was charged with committing conspiracy to commit murder. The elements of that offense are an agreement between two or more people to commit murder and an overt action by one of the parties in pursuance of the agreement. Tex. Pen. Code Ann. § 15.02(a). Such an agreement may be inferred by the parties' actions. *Id*. § 15.02(b). Paulk testified that he was ordered by appellant to go with Osmer to TC's apartment and that, should Osmer fail to carry out his orders, he was to kill both TC and Osmer. Jenkins testified that she overheard a conversation to that effect between appellant, Paulk, Osmer, and others. Williams testified that Osmer told her he had been ordered by appellant to kill TC, and his own life had been threatened if he failed to comply. Although the witnesses initially lied to the police, it was for the jury to take those earlier falsehoods into consideration in evaluating the credibility of the witnesses and resolving the evidentiary conflicts. *See Jones v. State*, 944 S.W.2d 642, 647 (Tex. Crim. App. 1996); *Doyle v. State*, 148 S.W.3d 611, 613 (Tex. App.—Austin 2004, pet. ref'd). We will not second-guess the jury's determination of those matters. We hold that the evidence is legally and factually sufficient to support the jury's verdict. We overrule appellant's first three issues.

### Was Appellant Entitled to a New Trial?

In his fourth issue, appellant argues that the trial court erred in overruling his motion for a new trial after appellant complained that his attorney did not inform him of a plea bargain offer.

Appellant filed a motion for new trial, and the trial court conducted a hearing on appellant's motion. At that hearing, the trial court stated that at the conclusion of the guilt/innocence phase of the trial, the trial court called the attorneys to the bench, "asked them if they could come

15

to some form of agreement as to the amount of time that [appellant] should serve," and told them that such an agreement "would be helpful to the court" and that the court would abide by a reasonable agreement. The court stated, however, that it would not have found an agreed forty-year sentence to be reasonable and would not have entered such a sentence.

Appellant testified that, had his attorney brought him a forty-year plea offer, he would have accepted the offer. In his affidavit, appellant's trial counsel, stated, "I discussed outside of the courtroom the possibility of reaching an agreement on the sentence. Mr. Bishop [the prosecutor] mentioned a figure of 40 years." He went on to say that he "failed to mention the judge's proposal or the assistant district attorney's offer to the defendant." Bishop, however, testified that after the court asked the attorneys to discuss punishment,

> [Trial counsel] tried to grab me that evening . . . . I indicated to him that I would think it over, discuss it with the other people in my office. . . . I said he could wait around if he wanted to talk, and he was gone when I came back from speaking to the jury.
>
> The next morning outside of the courtroom prior to the commencement of the punishment phase, he asked me if I had authorization to make him an offer prior to sentencing. I said—my conversation with [trial counsel] is, "If I made you an offer, it wouldn't be anything less than 40 years." That was the nature of our discussion.
>
> He said, "I think that we're just going to have a hearing."
>
> There was no further discussion. There was no pressing of [trial counsel] for me to make him a concrete offer, and I'm not representing to this court, nor did I ever represent to [trial counsel] that the 40 years was a solid, if you plead, this is what I would offer. Like I said, the nature of our discussion is it would be nothing less than 40, and no formal offer was ever made after the trial in this case.

Appellant's argument is that counsel was ineffective in failing to relay a forty-year plea offer and that the trial court therefore erred by overruling his motion for new trial. We review

a trial court's decision on a motion for new trial under an abuse of discretion standard. *Rent v. State*, 982 S.W.2d 382, 384 (Tex. Crim. App. 1998). A criminal defendant is entitled to effective assistance of counsel, which imposes on defense counsel the duty to inform his client of any plea offers made by the State. *Ex parte Wilson*, 724 S.W.2d 72, 73-74 (Tex. Crim. App. 1987); *Callahan v. State*, 24 S.W.3d 483, 485 (Tex. App.—Houston [1st Dist.] 2000, pet. ref'd).

The facts of this case are similar to those *Callahan*, in which the defendant averred that defense counsel said the State had made an offer for forty years, defense counsel testified that no plea negotiations took place, and the prosecutor stated that if an offer had been made, it would have been for at least fifty years. 24 S.W.3d at 485. The prosecutor also testified that it was not unusual for defense counsel to fail to actively seek a plea bargain. *Id*. The court held, "[a]ssuming, without deciding, that trial counsel was ineffective for not having pursued plea negotiations or conveying [informal] plea discussions," that Callahan had not shown he was harmed. *Id*. at 485-86. The court noted that the trial court acted within its discretion in resolving the conflict between Callahan's contentions and those by defense counsel and the prosecutor, that even an offer of fifty years would not have been "made" until it was approved by the prosecutor's supervisor, and that there was no evidence that such an offer would have been approved. *Id*. The court concluded that Callahan had not shown that he was harmed by any deficient representation. *Id*.

In this case, it does not appear that there was a plea offer that trial counsel failed to relay. At the close of the guilt/innocence phase, the trial court asked counsel to discuss possible plea agreements as to punishment. Counsel stated that he and Bishop briefly discussed a sentencing agreement and that Bishop "mentioned" forty years. Bishop testified that he told counsel, "*If* I made

17

you an offer, it wouldn't be anything less than 40 years" (emphasis added), but also said he made no concrete or solid offers.  The trial court could reasonably have concluded that there was no offer made that trial counsel then failed to convey.  Further, although appellant testified that he would have accepted a forty-year offer, the trial court stated that it would have considered such an agreement to be unreasonable and would have rejected it.  Therefore, appellant has not shown that he was harmed by any error.  *See Thompson v. State*, 9 S.W.3d 808, 812 (Tex. Crim. App. 1999) (to show ineffective assistance, defendant must prove that counsel's performance fell below objective standard of reasonableness *and* that deficient performance prejudiced defense).  Appellant has not shown that the trial court abused its discretion in denying his motion for new trial.  We overrule appellant's fourth issue on appeal.

## Conclusion

We have held that the evidence is legally and factually sufficient and that appellant was not entitled to a new trial.  We therefore affirm the trial court's judgment of conviction.

_____

David Puryear, Justice

Before Chief Justice Law, Justices Patterson and Puryear

Affirmed

Filed:   May 26, 2005

Publish

18