# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-06-00379-CR

**Jimmy Lee Simmons, Appellant**

**v.**

**The State of Texas, Appellee**

### FROM THE DISTRICT COURT OF MILAM COUNTY, 20TH JUDICIAL DISTRICT
### NO. CR21467, HONORABLE ED MAGRE, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

A jury found appellant Jimmy Lee Simmons guilty of aggravated robbery and assessed punishment, enhanced by a previous felony conviction, at twenty years' imprisonment. *See* Tex. Penal Code Ann. § 29.03 (West 2003). In his single point of error, Simmons contends that the testimony of an accomplice witness was not adequately corroborated. We will reverse the conviction and render judgment of acquittal.

## BACKGROUND

Justin Mendoza testified that he was at a friend's house around midnight, waiting for his girlfriend, Carmen Alonso, to get off work when Lamar Johnson, whom Mendoza recognized, came to the door and asked, "Is Mike there?" Mendoza said no, and Johnson rode away on his bicycle. A few minutes later, Alonso drove up to the house and Johnson returned on his bicycle. Mendoza testified that Johnson came up to the window of Alonso's car and said, "Who's that? Oh,

I thought it was somebody else," and then rode away again. Alonso and Mendoza went into the house and ten to fifteen minutes later, there was a knock on the door. Mendoza opened the front door and was confronted by Johnson, who was unmasked, and a man wearing a mask. The masked man pointed a gun at Mendoza's head and demanded his money. Mendoza testified that he could not see the man's face, but that the man was taller than Mendoza's own height of five feet, seven inches. The masked man continued to hold the gun on Mendoza while Johnson searched the house, rummaged through the kitchen, and took money and a cell phone from Mendoza's pockets. According to Mendoza, Johnson went outside and broke the window out of Alonso's car, taking her purse from inside. Johnson then returned to the house and spoke briefly with the masked man, who hit Mendoza in the face with brass knuckles before fleeing the house with Johnson. Mendoza retrieved a rifle from his friend's closet, went outside, and shot the rifle into the air. After shooting the rifle, he noticed the two robbers running down the street.

The police arrived on the scene shortly thereafter, and Mendoza gave them Johnson's name. No fingerprints were taken because Mendoza informed the police that the men had been wearing gloves.

Mendoza testified that the day after the robbery, he realized that the masked robber's voice "sounded very familiar to me." Mendoza explained that on the day of the robbery, he and a friend were in his car when a man flagged them down and asked for a ride. Mendoza stopped, but his friend told the man that they would not give him a ride. As Mendoza and his friend drove away from this encounter, Mendoza's friend, who did not testify, stated that the man who asked for a ride

2

was "Jimmy Lee."[1] Mendoza further testified that he was "not sure" if the voice he heard at the robbery belonged to the man his friend had identified as "Jimmy Lee," but "[i]t sounded like him."

Johnson was arrested for the robbery and he informed the police that Simmons, who was dating Johnson's mother and living with her at the time, had been the masked man with him during the robbery. Johnson admitted at trial that he was not initially honest with the police about the extent of his involvement in the robbery because he "thought [he] was going to get in more trouble than [he was] already in." He later agreed to testify against Simmons in return for a five-year sentence.

Johnson's testimony regarding the robbery contradicted certain details in Mendoza's testimony. Johnson testified that he heard the sound of Simmons hitting Mendoza with brass knuckles, but that he was not standing next to Simmons at the time. Mendoza, on the other hand, testified that both robbers were standing next to him when the masked man hit him. Johnson also testified that Simmons broke the window of Alonso's car, although Mendoza's testimony was that Johnson broke the car window. Johnson further denied riding up on his bicycle prior to the robbery and saying, "Who's that? Oh, I thought it was somebody else," when Alonso arrived at the house. He also denied searching the kitchen for drugs. When defense counsel noted these discrepancies between Johnson's and Mendoza's testimonies, Johnson maintained that Mendoza's statements were untrue.

---

[1] There was no hearsay objection to this portion of Mendoza's testimony. Simmons concedes that without an objection, this statement has probative value. *See* Tex. R. Evid. 802; *see also* Tex. R. Evid. 803(1) (present sense impression).

3

During Johnson's testimony, he identified a letter from Simmons that was delivered to him by another inmate while both men were in jail awaiting trial. The letter, admitted in evidence, reads (with spelling and punctuation as in the original):

> Mor,
> I don't know what the fucc is on your mind. What the fucc kind of shit or you doing. You talking to tha laws. So now you work for them. That's so ho ass shit my case is beat im not doing know trippin. I was tring to make a way so yours would be beat, but you go in snitch on your self and others. You claim to be a Gangsta but you don't even realize what the "G" stand for. I'm going to handle my legal work so after i write up a alphadavit im going to need you to read and sign it. Why would you bring me down if you had any love for me. You put my name in this shit and only you. You only care about you and that's bullshit man—that type of shit gets people killed. You put my life on the line cause you trippin. Holla bacc at me.

Randy Rodriguez, a jail deputy, testified that soon after Simmons was arrested, Simmons gave him what appeared to be a handwritten affidavit stating that Simmons was not involved in the robbery. Simmons asked Rodriguez to deliver the affidavit to Johnson for his signature. Rodriguez did so, but Johnson refused to sign it. Rodriguez returned the unsigned affidavit to Simmons. Two other jail employees, Kelley Anderson and Dustin Pierce, testified that Simmons asked them to witness an affidavit that purported to bear Johnson's signature. Both Anderson and Pierce refused to witness the document because they had not seen Johnson sign it.

The district court instructed the jury that Johnson was an accomplice witness and that they were not to consider his testimony unless they found it to be properly corroborated. The jury found Simmons guilty of aggravated robbery, and Simmons appealed on the ground that Johnson's testimony was not adequately corroborated.

4

## STANDARD OF REVIEW

A conviction cannot be had upon the testimony of an accomplice unless that testimony is corroborated by other evidence tending to connect the defendant with the offense. Tex. Code Crim. Proc. Ann. art. 38.14 (West 2005). The testimony of an accomplice witness "should be received and viewed and acted on with caution" because it is "evidence from a corrupt source." *Walker v. State*, 615 S.W.2d 728, 731 (Tex. Crim. App. 1981). To weigh the sufficiency of the corroborative evidence, we disregard the accomplice's testimony and examine the remaining evidence to ascertain if there is evidence tending to connect the accused to the offense. *Maynard v. State*, 166 S.W.3d 403, 410 (Tex. App.—Austin 2005, pet. ref'd). The remaining evidence need not be strong enough to establish the defendant's guilt beyond a reasonable doubt or directly link him to the commission of the offense. *Id*. However, evidence that merely proves that the offense was committed does not suffice. *Cathey v. State*, 992 S.W.2d 460, 462 (Tex. Crim. App. 1999). Examples of sufficient corroborating evidence include "subsequent flight, possession of the fruits of the crime, and presence at or near the scene of the crime at an unreasonable hour." *Wincott v. State*, 59 S.W.3d 691, 698 (Tex. App.—Austin 2001, pet. ref'd). We review a claim that accomplice witness testimony is insufficiently corroborated in the light most favorable to the verdict. *See Hernandez v. State*, 939 S.W.2d 173, 176 (Tex. Crim. App. 1997).

## DISCUSSION

Three pieces of evidence remain after Johnson's accomplice testimony is disregarded. First, there is Mendoza's testimony that the voice of the masked man "sounded like" the voice of a man that one of Mendoza's friends had identified as "Jimmy Lee." Mendoza testified that he was

5

"not sure" if the voice belonged to the same man that had robbed him and that he "wasn't positive," but "it might be" the same voice. Mendoza's uncertain testimony does not conclusively establish that the voice of the masked man belonged to the same man identified as "Jimmy Lee." Furthermore, there is no evidence suggesting that Mendoza's friend, who did not testify at trial, was correct in identifying the man as "Jimmy Lee," or that even if Mendoza's friend was correct, the man he identified was actually Simmons, rather than another man named Jimmy Lee. "In determining the strength of a particular item of non-accomplice evidence, we examine (1) its reliability or believability, and (2) the strength of its tendency to connect the defendant to the crime." *Herron v. State*, 86 S.W.3d 621, 632 (Tex. Crim. App. 2002). In light of the uncertainty of Mendoza's testimony, this evidence alone is insufficient to connect Simmons to the robbery.

The second piece of corroborating evidence is the note from Simmons to Johnson, expressing anger at Johnson for having given Simmons's name to the police. Simmons does not confess to any involvement with the robbery in the letter to Johnson, but merely chastises Johnson for telling police that Simmons was involved and asks him to sign an affidavit, presumably an affidavit exonerating Simmons. The language of the letter itself, which accuses Johnson of "talking to the laws" and putting Simmons's life on the line, does not connect Simmons with commission of the offense, but merely acknowledges the fact that Johnson gave Simmons's name to the police in connection with the robbery. Furthermore, letters sent from one inmate to another that merely reflect "reasonable concern about the outcome" of the writer's trial, but that do not link him to commission of the offense, have been held to be insufficient to corroborate accomplice testimony. *See Wincott*, 59 S.W.3d at 702.

6

The third piece of remaining evidence consists of Simmons's attempts to get Johnson to sign the affidavit exonerating Simmons. Simmons's request of Johnson to retract his previous statements regarding Simmons's involvement in the robbery does not necessarily link Simmons to the commission of the offense. Instead, Simmons's act of creating the affidavit could be construed as the efforts of an innocent man, currently facing serious criminal charges, to clear his name. Furthermore, this Court has held that "protestations of innocence, even in the form of asking [a testifying accomplice] to admit that he lied," are not sufficient to corroborate accomplice testimony because such evidence only indicates that the defendant "sought to bring out what he perceived to be the truth in the case." *Id.* at 703.

It is also worth noting that Mendoza testified that the masked robber was "definitely taller" than Mendoza's own height of 5' 7". The record includes documentation listing Simmons's height as 5' 7".

We hold that Johnson's accomplice testimony was not properly corroborated by (1) Mendoza's testimony that the voice of the man who robbed him "might" belong to a man his friend identified as "Jimmy Lee," (2) a letter from Simmons to Johnson that does not admit guilt but merely expresses anger at being implicated in a crime, and (3) an attempt by Simmons to get Johnson to sign an affidavit swearing to Simmons's innocence. Considered collectively, these combined factors do not tend to connect Simmons with the commission of the offense. *See Maynard*, 166 S.W.3d at 410. When there is insufficient evidence to corroborate accomplice testimony, the appropriate remedy is acquittal. *See Walker*, 615 S.W.2d at 733.

## CONCLUSION

Because the accomplice testimony against Simmons was not sufficiently corroborated, we reverse the judgment of conviction and render judgment of acquittal.

_____

W. Kenneth Law, Chief Justice

Before Chief Justice Law, Justices Waldrop and Henson;
   Dissenting Opinion by Justice Waldrop

Reversed and Acquittal Rendered

Filed:   April 10, 2008

Do Not Publish