**Opinion filed July 12, 2012**



In The

# Eleventh Court of Appeals

———————

## No. 11-10-00203-CR

———————

## BELINDA LONELL DAVIS, Appellant

## V.

## STATE OF TEXAS, Appellee

**On Appeal from the 29th District Court**
**Palo Pinto County, Texas**
**Trial Court Cause No. 13414**

## MEMORANDUM OPINION

The jury convicted Appellant, Belinda Lonell Davis, of capital murder for her role in the death of Roy Dean Davis. The State elected not to pursue the death penalty, and the trial court assessed a life sentence in the Institutional Division of the Texas Department of Criminal Justice, without the possibility of parole. Appellant argues that the trial court erred by denying her motion for directed verdict because the non-accomplice evidence was insufficient to connect her to the crime. We affirm.

### Background Facts

The State alleged in this case that Appellant caused the death of her husband, Roy Dean Davis, by employing her ex-brother-in-law, James Neil Cook, to murder Roy in exchange for an

Xbox and a Honda motorcycle. Cook was granted transactional immunity for his role in the murder in exchange for his truthful testimony at trial. Cook was treated as an accomplice, and the jury was instructed accordingly.

Cook was the common-law husband of Appellant's sister, Darlene Taylor from 1987 until 2002, when he began seeing a sixteen-year-old girl named Linda Moore. Cook testified that Appellant first approached him in 2002 looking for someone to "take care of" her husband. He thought at first that she was just looking for someone to beat up Roy in retaliation for physically abusing her. However, Appellant then told Cook that she wanted Roy dead. Cook told her he did not know anyone who could do that. The subject was dropped for a time, but Appellant later called Cook and continued to ask him about getting someone to kill her husband.

In April 2003, Cook finally agreed to kill Appellant's husband. Appellant gave him money to buy a shotgun, and Cook told her that, if she needed the job done, he would do it for her. Cook had a coworker, Lucas Randolph Mitchell, buy the gun under the premise that it was to be a birthday gift for Cook's stepson. Cook bought 12-gauge slugs from Walmart in Weatherford, without showing any identification. According to Cook, another coworker named Gregory Helton taught him how to use the gun. When Appellant learned that Cook had purchased a gun, her interest in the plan increased. She began calling Cook more often, asking him when he planned to kill her husband. The two agreed to the terms: Appellant was to get Cook an Xbox and a motorcycle in exchange for killing Roy. Additionally, he might be "taken care of" out of the proceeds of Roy's insurance policy. Appellant worked at Walmart. She furnished the Xbox to Cook by allowing him to check out at Walmart without making him pay for it. Cook never got the motorcycle, a Honda that Appellant originally purchased for her boyfriend.

Cook testified that he and Appellant had discussed several options for killing Roy. One plan involved luring Roy to a remote area, under the guise of assisting Cook with an automobile problem, and then shooting him on the side of the road. Cook said that this plan was actually set in motion but that they did not follow through with it. On the night that this plan was to take place, Cook drove in the direction of the Lazy Y Ranch. He phoned Appellant and asked her to send Roy out to help him. However, Cook had to call back and cancel the plan when another driver stopped and offered to help him. Cook realized that the driver who stopped to help him

was a potential witness who could place him at the scene, and he decided to cancel the plan for that night.

Appellant came up with the next plan. She decided that they should stage a burglary. She called Cook several times the night before the murder to discuss the plan. He was to meet her at the house at 4:30 or 4:45 a.m., she would let him in, and he would shoot Roy and take a few things before leaving so that it would look like burglary was the motive for the shooting. Appellant planned to go into work afterward in order to provide an alibi for herself.

When Cook arrived, Appellant was waiting for him outside the house. She said she would put the dog outside and told him to climb over the back fence and meet her in the backyard. Cook went in with the gun loaded, and Appellant showed him where Roy was sleeping. Cook asked her if she was sure. Then he went to the bedroom, knelt down just inside the door, and shot Roy as he lay sleeping.

When Cook went to the living room, Appellant asked him, "Are you sure he's dead?" Cook went back to the bedroom to double check; he came back to the living room and told her that Roy was indeed dead. Cook took some CDs, a DVD player, and a handheld video game device and drove back to Weatherford. On his way, he threw everything out the window, including the shotgun shells. Then he met a coworker and went to work.

According to Cook, Appellant was still at the house when he left after shooting Roy. He called her on his way home around 5:30 a.m. to make sure that she was okay and that the sound of the gun had not roused the neighbors, though he did not see anyone around when he left. He called Appellant again around lunchtime. That afternoon, he got a call from Taylor informing him that Roy had been killed. She asked him to come home. He got a ride to Weatherford with a coworker, got his pickup, and drove toward Whitt. On his way there, he threw the murder weapon out into some bushes off Adell Road. He spoke to Appellant a few more times after that but mostly tried to establish "distance" from her.

Deputy Bobby Walton brought Cook in for questioning a couple of weeks after the crime. The police found out that Cook, a convicted felon, had been in possession of a gun. Cook had previously spent almost ten years in prison for a number of convictions and was still on parole in 2003. When confronted with the signed statements of his coworkers, Cook admitted that he had possessed a firearm. Cook was worried about being charged with being a felon in possession of a firearm. But he thought his girlfriend, Linda Moore, would provide him a good alibi for the

murder. Deputy Walton told Cook that he would not press charges against him for being a felon in possession of a firearm if Cook gave up the weapon; Cook agreed and showed Officer Jim Roberts where he had hidden the gun. After taking some photographs, the officers collected the gun. Cook did not hear anything else about the matter for a year.

In the meantime, Cook pawned the Xbox. Later, Cook's parole was revoked and he went to prison. While Cook was in prison, the Palo Pinto County District Attorney, Michael K. Burns, visited him. Burns offered Cook immunity for the murder of Roy in exchange for his testimony against Appellant and gave him one hour to decide whether or not to take the offer before the same offer was made to Appellant. Furthermore, Burns told Cook that, if he did not take the offer, the State would pursue the death penalty. Cook took the offer.

The State offered into evidence the phone records between Appellant and Cook. Cook identified the phone numbers in the records as belonging to Appellant and himself. Appellant called Cook twenty-two times during the month of April. Cook called Appellant four times, all on the day of the murder. On the day of the murder, there was a call from Cook's cell phone to Appellant at 5:22 a.m. that lasted just over seven and one-half minutes. None of the other calls were made that early.

Mitchell corroborated Cook's testimony about how the murder weapon was obtained. He said he would not have purchased the gun for Cook because he knew that Cook was a felon, but he thought it would be alright since the gun was to be a gift for someone else. Lisa Garrett of Garrett's Jewelry and Loan testified about selling the gun to Mitchell and about the forms signed by Mitchell that Garrett submitted to the Bureau of Alcohol, Tobacco and Firearms for approval of the purchase. Helton testified and confirmed Cook's assertion that it was Helton who taught Cook how to shoot slugs with the 12-gauge shotgun and showed him the range of fire.

Maria Ramirez, a fifteen-year Walmart employee, confirmed that it was possible to check out a person with multiple items without ringing up one of the items, such as an Xbox, so that the customer could leave without paying for a particular item. The State submitted into evidence the pawn shop receipt corroborating Cook's testimony that he had pawned the Xbox at Uncle Joe's Pawn Shop in Weatherford. The pawn ticket bears the name James Neil Cook and shows the receipt of an Xbox game system. Taylor confirmed that the phone numbers in the records that Cook testified about belonged to Appellant and Cook. Taylor also testified that she had bought an Xbox for her children, that Cook took it with him when he left her, and that she did not see it

4

again. She could not remember exactly what she paid for it, and she could not describe what it looked like.

Ramirez had been Appellant's coworker at Walmart for three years. Ramirez testified that, on the day of the murder, Appellant came into the store earlier than usual. Ramirez arrived at 5:30 a.m., as was her custom, and Appellant arrived shortly afterwards. Appellant usually started work around 7:00 a.m. and had told Ramirez that her husband got upset when she came in early. It was unusual for Appellant to arrive early unless there was a mandatory meeting; Ramirez was "shocked" to see Appellant there so early. Appellant told Ramirez that she had arrived early in order to do inventory in her department, though it was not on the schedule. Ramirez testified that it was very unusual for one person to do inventory alone. Inventory was typically a mandatory event that took place every six to eight months, was overseen by management, and was preceded by a mandatory meeting. According to store policy, inventory was something that had to be completed within the same work day. It would be impossible for one employee, working alone, to complete the inventory for such a large department as electronics.

Another of Appellant's Walmart coworkers, Cynthia Little, confirmed that it was unusual for Appellant to be attempting an inventory on her own. Inventories were scheduled in advance to be completed by a group of managers working together. It was impossible to complete them alone within the time frame mandated by Walmart. Little recalled the day of the murder. When Little heard that Appellant was doing inventory, she went to the electronics department to speak to Appellant and offer to help. Appellant was "erratic," "bouncing off the walls," "nervous," and even cried at one point, telling Little "she was under a lot of stress, and she didn't [know] how much more she could take."

Around lunchtime, Ramirez went to the employee break room and saw Appellant there. Appellant received a call informing her that Roy had not shown up for work. According to Ramirez, Appellant became "a little hysterical." Appellant voiced her concern "very loudly" in the crowded break room. She worried aloud that something had happened to Roy because it was unlike him to miss work. Appellant asked several of her coworkers to accompany her home to check on Roy, but only Ramirez agreed to go because it was getting close to the end of their break time. Appellant drove Ramirez to her house. During the drive, Appellant drove very fast,

cried, and was "very upset, hysterical . . . and just going on and on [about] just how upset she was." She worried that Roy might have suffered a heart attack.

At the house, Ramirez waited in the car, and Appellant checked the back of the house first. Ramirez saw that a dog was in the gated front yard. Appellant came back to the front of the house and told Ramirez that Roy was not in the backyard and that she was going to check inside the house. Appellant went inside the house and came right back out screaming that her husband was dead, that there was blood everywhere, that his eyes were open, and that he had been shot. She had only been inside the home for a very short time.

That evening, Ramirez told police that Appellant had been in the home a minute or less. During that first interview, the police had not asked her to be exact in her estimation of the time. During a meeting with the district attorney a week prior to trial, she had estimated the time to be around ten seconds. At trial, using a stopwatch, Ramirez estimated the time that Appellant was in the home to be about six or seven seconds. She was clear though that it was less than a minute and that it was an amount of time that she felt was very short.

When Appellant came outside the home exclaiming that her husband had been shot, Ramirez's first reaction was to go inside the house and call the police because there was no cell phone reception in the driveway. Appellant would not allow Ramirez to enter the home and said to Ramirez, "I don't want you to see that." But Ramirez persisted, and Appellant eventually let her go in to get the cordless phone from a table that was just inside the front door. Ramirez called 9-1-1 and asked Appellant what she should tell the operator. Ramirez relayed Appellant's statements to the operator that Roy had been shot and that there was blood everywhere. Appellant asked that the information not go out over the police scanner because Roy's family listened to the scanner all the time and she did not want them to hear about it that way.

Appellant and Ramirez stayed at the house as police arrived and began going in and out of the home. Eventually, they were taken to the police station where their hands were dusted for gunpowder residue. That evening, Ramirez reflected upon the events of the day and had a "very bad feeling" about it. She felt that "something was wrong; something wasn't right" and that it was all "just not adding up." Specifically, she found it odd that Appellant had "run scared" from her husband upon finding him in the state he was in, instead of holding onto him and calling for help from there. She also found Appellant's hysterics earlier that day over finding out that her husband had not gone to work concerning.

About a week after Roy was killed, Appellant called Ramirez and asked her to meet with some other coworkers at a local park that night. At the meeting, Appellant told Ramirez and the others that the police were harassing her about the murder. Appellant said that the police were accusing her of saying that there was "blood everywhere" or that Roy "had been shot." Appellant tried to get Ramirez to agree that Appellant had never said those things. Ramirez did not agree but, instead, argued, "Yes, Belinda, you said that . . . I was there. I know what I heard." They spent over an hour at the park talking only about the incident. Appellant insisted that she had never said that there was blood everywhere or that Roy had been shot. However, the 9-1-1 tapes that were played at trial confirm Ramirez's version of events. There were two calls. The first call was between Ramirez and dispatch, reporting the murder. Appellant can be heard in the background saying that "there is blood everywhere" and "his eyes are open." The second call was the dispatch speaking to Appellant in order to get more information. On the second call, Appellant identified herself and told the dispatch operator that her husband had been shot.

The police were asking Appellant about her statements because the scene they found was very different from what Appellant had described to Ramirez and the 9-1-1 dispatcher. Roy had been shot in bed, just as Cook said. According to forensic pathologist Dr. Janis Townsend-Parchman, her findings were consistent with Cook's description of how he had knelt and shot Roy from the doorway. Townsend-Parchman testified that the weapon was fired from close range. But, in contrast to Appellant's statements about the condition in which she had found the body, there was not "blood everywhere"; Roy's eyes were closed, not open; and it was not immediately apparent that he had been shot. Former Texas Ranger Russ Althier testified that they could not tell what had happened to Roy by looking at him as he lay in bed. Constable Jim Roberts testified that Roy appeared merely to be sleeping. Only his head and one hand were visible. Roy had been shot in the heart through his arm. The bullet made a very small hole in the bedcover that was only visible upon a more detailed inspection of the scene. Ranger Althier testified that Roy's hand was clutching the bedding in a "death grip" and that it was very unlikely that someone could have pulled back the covers, viewed the body, put the covers back in place, and tucked them back into Roy's hand as he was holding them when the officers examined him.

The jury heard from Little that Appellant told her about a year before the crime that Roy was being abusive. Little saw a bruise on Appellant's cheek that Appellant attributed to Roy's throwing a television remote control at her face. According to her own testimony, Appellant and Roy separated in 2002, and she became involved with Robert York during the separation. Appellant said this separation was motivated by Roy's drug use, though she was not sure whether the drug was "crank or crack." Appellant told Little that she was paying for gifts with Roy's credit cards. During this time, Little witnessed a phone call between Roy and Appellant that made Appellant very upset. Appellant told Little that Roy had threatened to beat up York; Appellant was worried York's parole would be revoked. Appellant told Little that she had spoken to her ex-husband Asa about Roy and that he had told her "all you have to do is just give me the word, and I will kill him." Little said, "[Y]ou don't mean that," and Appellant replied, "Oh, I do too."

Roy's son Dustin testified that he lived with Appellant and Roy until two days prior to the murder. Dustin was familiar with both Appellant's and Roy's schedules. Roy typically left the house for work each day by 5:30 a.m. At 8:00 a.m. on the day of the murder, Dustin noticed that Roy had not yet arrived and called Appellant to check on Roy. Appellant told him that Roy was "up and ready" when she left for work. Appellant told the police, and testified at trial, that Roy was in bed when she left for work. Dustin testified that Roy had a yellow Labrador named Tinkerbell. The dog was always with Roy, slept in Roy's bedroom every night, and was very protective of him. The dog would bark at anyone who entered the home, even those persons with whom she was familiar.

Dustin confirmed that there was an evening close in time to Roy's murder when Roy asked him to accompany him to help Cook start his car. Dustin testified that Roy looked "kind of worried" and asked him to go along for the ride. As the two were getting in the car to go assist Cook, Appellant came out of the house and said, "Never mind. He doesn't need it. He got it started." Dustin testified that he let both Roy and Appellant know that he was moving out and that they had at least a week's notice that he would be out of the house.

Appellant testified in her own defense. She denied that she had hired Cook to kill Roy. Appellant said she never told Cook that she wanted her husband dead. She admitted in her testimony that she put the dog outside that morning, but said it was because the dog wanted to go out. She admitted that she did not lock the door, but said that it was their custom never to lock

the door unless they were leaving town. Appellant admitted that Cook called her early that morning, but said that it was to discuss a fight that he had had with her sister the night before.

Deputy Walton testified that one of the factors that led him to believe that Roy's death was a murder for hire was that Roy was insured for $146,000 and Appellant was the sole beneficiary. Appellant testified that she thought Appellant's life insurance was only worth $15,000 at the most and that she had never followed through with a claim on any of his insurance policies. On cross-examination, she admitted that she had initiated a claim, which she withdrew when she found out that the insurance company was making calls to the sheriff's department. She also admitted that she made a claim on Roy's social security.

As to the testimony of her former coworkers, Appellant essentially denied Little's and Ramirez's version of events, calling them "untrue." She testified that she never said anything about her ex-husband Asa offering to kill Roy. She said that Roy had never abused her. Appellant denied Ramirez's testimony that she was hysterical immediately upon finding out that her husband had not shown up to work. On the contrary, she said that he often took days off work and that the only reason she went to the house was because Dustin was worried and could not leave his job to check on Roy himself.

Appellant testified that she was doing inventory that day, just as she had told Ramirez, and that it was not unusual for her to be doing that. She also testified that it was not unusual for her to arrive at work early. Further, Cook never "checked out" in her lane at Walmart because Walmart had a policy against employees "checking out" their own family members and close friends. Dustin was wrong about the time that he and Roy typically went to work. According to Appellant, they went in at 7:00 a.m., not 6:00 a.m. Appellant admitted that she had called a meeting of her coworkers but denied that she had tried to get anyone to change their story.

As far as what she saw inside the house on the day of the murder, Appellant said she could not remember anything. She testified that she could not recall anything from the time that she pushed the door open until she was back outside screaming. She denied telling Deputy Walton in her second police interview that she saw Roy's face when she opened the bedroom door. She claimed that she could not even remember the Coca-Cola cover on the bed or telling Deputy Walton that she might have mistaken the red color of the bedspread for blood. She could not remember screaming to Ramirez that there was blood everywhere or telling anyone that Roy had been shot. Although Appellant was able to identify her own voice on the 9-1-1 recording,

9

she could not recall making the statements heard on the recording. She acknowledged that the recording reflected that she told the dispatcher that Roy had never failed to show up at work without calling; he "never [did] that in 23 years of work."

*Sufficiency of the Corroborating Evidence*

In her sole point of error, Appellant argues that the court erred in overruling her motion for directed verdict at the close of the State's evidence because the non-accomplice evidence corroborating that Appellant was connected to the crime was insufficient to support the jury's verdict.

In Texas, a conviction cannot be had upon the testimony of an accomplice unless that testimony is corroborated by other evidence tending to connect the defendant with the offense. TEX. CODE CRIM. PROC. ANN. art. 38.14 (West 2005). The testimony of an accomplice witness is inherently untrustworthy and should be received and acted on with caution because it is "evidence from a corrupt source." *Walker v. State*, 615 S.W.2d 728, 731 (Tex. Crim. App. 1981); *Wincott v. State*, 59 S.W.3d 691, 698 (Tex. App.—Austin 2001, pet. ref'd). This accomplice-witness rule creates a statutorily imposed review and is not derived from federal or state constitutional principles that define the factual and legal sufficiency standards. *Druery v. State*, 225 S.W.3d 491, 498 (Tex. Crim. App. 2007). Thus, to weigh the sufficiency of the corroborative evidence, we disregard the accomplice's testimony and examine the remaining portions of the record to ascertain whether there is evidence tending to connect the accused with the commission of the crime. *Solomon v. State*, 49 S.W.3d 356, 361 (Tex. Crim. App. 2001); *Maynard v. State*, 166 S.W.3d 403, 410 (Tex. App.—Austin 2005, pet. ref'd). Because the standard is "tendency to connect," rather than a rational-sufficiency standard, the corroborating evidence need not be sufficient by itself to establish guilt beyond a reasonable doubt. 49 S.W.3d at 361. If the combined weight of the non-accomplice evidence tends to connect the defendant to the offense, then the requirement of Article 38.14 has been fulfilled. *Cathey v. State*, 992 S.W.2d 460, 462 (Tex. Crim. App. 1999). We review the non-accomplice evidence in the light most favorable to the verdict. *See Hernandez v. State*, 939 S.W.2d 173, 176 (Tex. Crim. App. 1997); *Gill v. State*, 873 S.W.2d 45, 48 (Tex. Crim. App. 1994).

Appellant tried to persuade Ramirez that she had never said the words "he's been shot" on the day of the murder. She herself argued, "No. I couldn't have known that [Roy] was shot." Veteran crime scene investigators testified that they could not tell what had happened to Roy on

first glance. Appellant was in and out of the home in a matter of seconds. The scene Appellant described, as heard on the 9-1-1 tapes and testified to by Ramirez, did not match the scene that the police found. The evidence tends to show that Appellant did know, without having to look for herself, that Roy had been shot. That alone tends to connect her to the crime. However, there is much more here that connects Appellant to the offense.

There was evidence of motive, both financial and emotional. There was evidence that Appellant previously expressed a desire to Little to have Roy killed. There was evidence that Appellant had the means to pay off Cook by exploiting a weakness in Walmart's checkout procedure. Appellant's behavior on the day of the murder was very unusual, and the alibi that she attempted to establish was not plausible according to her coworkers' testimony. Her reaction to finding out that her husband had stayed home from work was disproportionately overwrought. Appellant gave no explanation for the testimony of her former friends and coworkers, other than to deny their version of the events.

The murder happened two days after Roy's son moved out of the home. Roy's extremely protective dog, who usually slept in Roy's bed, was left outside. The door was left unlocked. In addition to all of this, many details of Cook's story were corroborated by other witnesses. Not the least of these details were the phone records corroborating Cook's account of how Appellant began calling him frequently after he got the gun and the record of the call between Appellant and Cook at 5:22 a.m. on the day of the murder.

Viewed in a light most favorable to the verdict, Cook's testimony was sufficiently corroborated. Appellant's sole point of error is overruled.

The judgment of the trial court is affirmed.


ERIC KALENAK
JUSTICE


July 12, 2012

Do not publish. *See* TEX. R. APP. P. 47.2(b).

Panel consists of: Wright, C.J.,
McCall, J., and Kalenak, J.

11