# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-10-00730-CR

**Juan Diego Aguilar, Jr., Appellant**

**v.**

**The State of Texas, Appellee**

## FROM THE DISTRICT COURT OF TOM GREEN COUNTY, 51ST JUDICIAL DISTRICT NO. A-09-0967-SA, HONORABLE BARBARA WALTHER, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

A jury found Juan Diego Aguilar, Jr. guilty of aggravated assault with a deadly weapon, enhanced to a first-degree felony due to a prior conviction. *See* Tex. Penal Code Ann. § 12.42 (West 2011), § 22.02 (West Supp. 2011). A jury assessed his punishment at fifty years' confinement and a fine of $10,000. Aguilar's criminal responsibility for the offense was proved largely through the testimony of four witnesses: Virginia Cardenas, Gabriel Wilkins, and teenagers M.D. and S.M. The trial court instructed the jury that Cardenas was an accomplice as a matter of law but submitted the question of whether Wilkins, M.D., or S.M. were accomplices to the jury. In one point of error, Aguilar claims that all of these witnesses were accomplices whose testimony was uncorroborated, with the result that insufficient evidence supported his conviction. *See* Tex. Code Crim. Proc. Ann. art. 38.14 (West 2005). We affirm the judgment of conviction.

# BACKGROUND

On the evening of July 12, 2009, police responded to a shooting at a home in San Angelo in Tom Green County, Texas.[1] The victim, Joe Robles, had suffered numerous wounds from shotgun pellets in his back and abdomen but survived. An investigation led to the arrest and indictment of Aguilar for aggravated assault with a deadly weapon. At Aguilar's trial before a jury, several witnesses testified to the events that night.

## Testimony of M.D.

M.D., who is Aguilar's stepson, was living with Aguilar that July even though his mother and Aguilar were separated. M.D. testified that on the night in question, he and his girlfriend, S.M., were with Aguilar at the home of Virginia Cardenas, where they were all drinking alcohol and using methamphetamine.

M.D. testified that at one point, he heard loud voices outside and saw Cardenas standing in the doorway of the house, "cussing back and forth" with someone outside. Cardenas then went into the kitchen, got a knife, and went back outside, where she swung the knife but did not hit anyone. M.D. next heard Aguilar place a telephone call to a friend, asking him to bring a gun. Fifteen minutes later, Gabriel Wilkins arrived in a truck with a couple of other men.

M.D. admitted that he left with Wilkins and Aguilar in the truck, knowing that they were "going to find the guys" who had been "talking mess to" Cardenas. From the back seat of the truck, M.D. saw what he thought was a shotgun, which Aguilar loaded. They drove around for about

---

[1] The facts recited herein are taken from the testimony and exhibits presented at trial.

ten minutes, but "didn't find anybody." At this point, Aguilar called Cardenas to ask if she knew where the men who had been to her house lived. After Aguilar hung up the phone, Wilkins started driving to the east side of San Angelo.

M.D. testified that they ultimately saw two men standing near a car parked outside a house. Wilkins drove past the house as Aguilar attempted to pump the shotgun, which was sticking. After they circled the block three times, Aguilar shot one of the two men outside. M.D. recalled that when the shotgun recoiled, it hit Aguilar's lip. Aguilar then shot the man again.

According to M.D., they drove back to Wilkins's house, where M.D. saw that Aguilar's lip was purple, swollen, and bleeding. About twenty minutes later, Cardenas and S.M. joined them. While M.D. was talking with S.M., they heard an ambulance pass by, which frightened S.M., causing her to cry and throw up. Later, Cardenas, S.M., and M.D. went back to Cardenas's house for the night. M.D. testified that he received juvenile probation stemming from this incident and was required to move away to live with his biological father.

**Testimony of S.M.**

S.M. also testified that she was at Cardenas's house with Aguilar, Cardenas, and M.D. that night. She told the jury that she and M.D. were in one of the front rooms of the house when Aguilar knocked on the door and told M.D. to come outside because "someone pulled a knife on" Cardenas. S.M. heard Aguilar make a phone call and tell someone to "load something" and come pick up Aguilar and M.D. Shortly thereafter, "[Aguilar's] friend came over in the truck and picked up [Aguilar] and [M.D.]," who told S.M. to go with Cardenas. S.M. joined Cardenas in her car, thinking that they were just going for a drive. According to S.M.,

3

> We drove by some houses and there was two guys outside. And [Cardenas] asked to use my phone . . . . So she texted them. And I guess she ended up showing [Aguilar] and [M.D.] and his friend where the house was that the guys were at. And she used my phone to text them, to call because she found them.

After texting Aguilar, Cardenas stopped the car at a stop sign and waited a few minutes until they saw the headlights of a truck. S.M. said that she believed, but could not be sure, that this was the truck in which M.D. and Aguilar were riding. On seeing the headlights, she and Cardenas left. They returned to Cardenas's home for a while and then, upon receiving another phone call from Aguilar, went to Wilkins's home. While there, S.M. saw that Aguilar had an injured lip. At one point, they heard sirens from an ambulance arriving at a nearby hospital. Feeling nervous and afraid, S.M. threw up in Wilkins's backyard. Cardenas eventually brought her and M.D. back to Cardenas's house for the night.

**Testimony of Virginia Cardenas**

Cardenas testified to much of the same sequence of events that evening. She claimed she was at her house with Aguilar, M.D., and S.M., all using methamphetamine, when six men including Joe Robles pulled up in a white car. An argument broke out, and one of the men with Robles pulled a knife, so she did the same. Afterward, Cardenas heard Aguilar on the phone saying he was going to get them, meaning Robles and the man who had pulled the knife on Cardenas.

Cardenas testified that a truck pulled up and soon left with Aguilar and M.D., while Cardenas left in her car with S.M. She decided at some point to drive toward the house where she knew Robles's mother lived, after which she asked S.M. to text Aguilar to ask where he was.

4

Instead of a return text, Cardenas got a phone call from Aguilar, asking where she was. She told him, and he responded to go home once she saw his headlights. When Cardenas saw headlights in her rear view mirror, she drove away.

At home, Cardenas got a phone call from Aguilar asking her to bring him his clothes and pipe. She brought S.M. to Wilkins's house, where Wilkins, Aguilar, and M.D. were waiting. She testified that Aguilar had an injured lip, which he had not had earlier that night, and which he explained by saying that the gun hit him in the mouth. They heard ambulances, and Aguilar stated, "Listen, there they go to get him." After everyone smoked some methamphetamine, Cardenas took S.M. and M.D. back to her house. Cardenas testified that she had been charged with the same offense as Aguilar, aggravated assault with a deadly weapon, and pled guilty in exchange for ten years' deferred probation.

**Testimony of Gabriel Wilkins**

Also testifying to the events on the night of the shooting was Gabriel Wilkins. Wilkins admitted that he, too, was using methamphetamine that night. He testified that Aguilar called him to help with "somebody [who] was starting some stuff with him," asking Wilkins to bring a 12-gauge shotgun he owned. Wilkins drove to Cardenas's house in his brother's truck with his brother and cousin inside.

M.D. and Aguilar left Cardenas's house in the truck with Wilkins. Aguilar said the people they were looking for had been walking, so the group drove around until Cardenas called to tell Aguilar where "they" were. Wilkins told the jury that he thought Aguilar would fight the men who were walking, and if they "pulled something out," then Wilkins and Aguilar would have the

5

shotgun. "But that didn't happen," Wilkins stated. Instead, after they drove around the block three times, Aguilar "shot twice" out of the front passenger window at two men coming out of a white car. While firing, Aguilar injured his lip.

Wilkins said that Aguilar's injured lip caused blood to get on the interior of the truck door, and he was sure because he saw Aguilar trying to clean it out later. The group returned to Wilkins's house, where he put the gun in the garage and got the shells out of his truck. Cardenas joined them with S.M., who was "tripping out." Aguilar stayed the night, then came by after a couple of days and picked up the shotgun. Wilkins testified that he had not heard from Aguilar since.

**Testimony of Joe Robles**

Victim Joe Robles also testified at trial. He stated that he did not know Aguilar, but he had known Cardenas since junior high school, and he was outside her home earlier on the same night he was shot. Robles was with his first cousin, Jimmy Mendoza. Both men had been drinking, and Robles admitted that his purpose in going to Cardenas's home was to score some "ice." With them were four other men, one of whom began arguing with Mendoza. At some point, Cardenas came outside to tell them to leave, and Mendoza and Cardenas both took out knives. In addition, "another guy came out of nowhere" and "started swinging at" Robles. When Robles backed onto a nearby empty lot, the man pursued him with a baseball bat he took from the trunk of a car, swinging it at Robles and Mendoza but missing. It was too dark to see the man's face, but as Robles left the area on foot, he heard the man say, "I'll be back."

Robles and Mendoza returned to Robles's mother's house, where they sat and talked for a while in his car. As Robles stood up to go inside to sleep, he heard a loud pop and dropped to

6

the ground, realizing he was shot. He testified that he ran around to the back of the home and jumped inside through a window, but could remember no more of that night.

**Testimony as to the police investigation**

In addition to this evidence, the State presented an array of police testimony. This included the testimony of patrol officer Steve Dophied, who responded to the shooting call on July 12, 2009. On arriving, Dophied observed the victim, later identified as Joe Robles, lying bloody on the floor. While other officers and emergency personnel attended to Robles, Dophied spoke with Mendoza, who directed him outside to look for signs of a shooting. Dophied saw two vehicles with what looked like shotgun pellet damage, two shotgun "wads" on the ground, and damage to a neighbor's window with a shotgun pellet on the inside ledge.

Former Detective John Ford also testified that he responded to the scene. From speaking to Mendoza, Ford narrowed in on the residence of Virginia Cardenas as the place where events might have started that night. He soon proceeded there and found Cardenas, M.D., and S.M. and spoke with them. According to Ford, he felt "they weren't being completely truthful" and "their stories didn't really add up." After interviewing S.M. again at the police station the next day, the officers obtained a warrant to search Wilkins's house.

While police were at Wilkins's house, Wilkins's brother pulled up in the type of pickup truck they were looking for. After obtaining permission, Ford personally searched and inventoried the truck, finding what appeared to be blood inside the passenger door. Crime scene technicians obtained a sample of the substance for testing. Ford then prepared complaints against Cardenas and Aguilar and obtained a search warrant for Aguilar's blood. Forensic experts testified that the sample from the truck tested positive for blood and that it matched the blood sample obtained from Aguilar.

7

Ford testified that he originally thought S.M. might be subject to prosecution for her involvement, because her phone was used to make the call to shoot the victim. However, when asked at trial if he currently considered S.M. to be an accomplice, he answered, "Not really . . . . I don't believe she was fully aware of what was going on and what actually all was going to happen." Ford stated, "I'm not sure that she developed the . . . actual mental culpability to actually charge her with a crime."

**Testimony of Juan Diego Aguilar, Jr.**

Finally, Aguilar testified in his own defense. He described the initial altercation with Joe Robles, Robles's cousin, and the four other men in the white car in essentially the same way that Cardenas, M.D., and S.M. had. However, he denied all the subsequent events they recounted. Aguilar claimed that after Robles and his group left Cardenas's house, he also left on foot for the residence of Viviana Rivas, where his girlfriend, Michelle Regino, was babysitting. Rivas and Regino appeared as alibi witnesses, testifying that Aguilar was with Regino and Rivas's children all night. Aguilar also explained that the blood on the truck door was the result of an injury to his finger from a fishing trip he had previously taken in Wilkins's brother's truck. He accused the other witnesses of lying and criticized their accounts of the night's events as inconsistent.[2]

**Procedural background**

After the close of evidence, the jury was given the court's charge, which included an instruction defining "accomplice witness" and explaining that a jury cannot consider accomplice-

---

[2] Primarily, Aguilar pointed out that the witnesses gave conflicting accounts of the color of the truck they saw on the night of the shooting. In the various witnesses' testimony, the truck was described as white, silver, gold, and brown.

witness testimony unless it is corroborated by other evidence tending to connect the defendant to the offense. The court further instructed the jury that Virginia Cardenas was an accomplice as a matter of law. The jury returned with a verdict of guilty. Aguilar elected to have the jury assess punishment and pleaded true to the enhancement of a previous second-degree felony conviction of robbery. After the presentation of evidence, the jury assessed punishment at confinement for fifty years and a $10,000 fine.

Aguilar appeals, claiming that insufficient evidence supported his conviction because (1) no jury could rationally find S.M., Wilkins, and M.D. not to be accomplices as a matter of fact; (2) the trial court should have instructed the jury that Wilkins and M.D. were accomplices as a matter of law; and (3) there was insufficient evidence to corroborate the testimony of the accomplice witnesses.

## STANDARD OF REVIEW

Under Article 38.14 of the Texas Code of Criminal Procedure, a conviction cannot be had upon the testimony of an accomplice unless that testimony is corroborated by other non-accomplice evidence tending to connect the defendant with the offense. Tex. Code Crim. Proc. Ann. art. 38.14. The testimony of an accomplice witness is considered to be inherently untrustworthy and should be received and acted on with caution because it is "evidence from a corrupt source." *Walker v. State*, 615 S.W.2d 728, 731 (Tex. Crim. App. 1981); *Wincott v. State*, 59 S.W.3d 691, 698 (Tex. App.—Austin 2001, pet. ref'd).

Although Aguilar brings this appeal as a challenge to the sufficiency of the evidence supporting his conviction, the accomplice-witness rule creates a statutorily imposed review and is not derived from federal or state constitutional principles that define the legal sufficiency standard. *Druery v. State*, 225 S.W.3d 491, 498 (Tex. Crim. App. 2007); *Cathey v. State*, 992 S.W.2d 460, 462

9

(Tex. Crim. App. 1999) ("We decline appellant's invitation to impose legal and factual sufficiency standards upon a review of accomplice witness testimony under Article 38.14."); *see also Brown v. Collins*, 937 F.2d 175, 182 n.12 (5th Cir. 1991) ("[T]he Constitution imposes no requirement that the testimony of an accomplice-witness be corroborated by independent evidence.").

Consequently, to weigh the sufficiency of the corroborative evidence, we apply a statutory standard by which we disregard the accomplice's testimony and examine the remaining portions of the record to ascertain whether there is any evidence tending to connect the accused with the commission of the crime. *Solomon v. State*, 49 S.W.3d 356, 361 (Tex. Crim. App. 2001); *Maynard v. State*, 166 S.W.3d 403, 410 (Tex. App.—Austin 2005, pet. ref'd). Because the standard is "tendency to connect," the corroborating evidence need not be sufficient by itself to establish guilt beyond a reasonable doubt. *Maynard*, 166 S.W.3d at 410. If the combined weight of the non-accomplice evidence tends to connect the defendant to the offense, then the requirement of Article 38.14 has been met. *Cathey*, 992 S.W.2d at 462. We review a claim that accomplice-witness testimony is insufficiently corroborated in the light most favorable to the verdict. *See Hernandez v. State*, 939 S.W.2d 173, 176 (Tex. Crim. App. 1997). The non-accomplice evidence is sufficient corroboration if rational jurors could find that it tends to connect the accused to the crime. *Smith v. State*, 332 S.W.3d 425, 442 (Tex. Crim. App. 2011).

**DISCUSSION**

In the present case, the trial court declared Cardenas to be an accomplice as a matter of law while submitting the question of whether S.M., Wilkins, or M.D. were accomplices to the jury to determine as a matter of fact. On appeal, Aguilar alleges that no rational jury could find that S.M.,

10

Wilkins, and M.D. were not accomplices and that the trial court should have included Wilkins and M.D. in its jury instruction as accomplices as a matter of law. Outside of these accomplices' testimony, Aguilar claims, no evidence tends to connect him with the shooting of Joe Robles. We turn first to Aguilar's arguments with regard to the accomplice status of S.M., Wilkins, and M.D.

**Determining accomplice status**

"An accomplice is an individual who participates with a defendant before, during, or after the commission of a crime and acts with the requisite culpable mental state." *Cocke v. State*, 201 S.W.3d 744, 748 (Tex. Crim. App. 2006). An accomplice witness's participation must involve an affirmative act that promotes the commission of the offense with which the defendant is charged. *Paredes v. State*, 129 S.W.3d 530, 536 (Tex. Crim. App. 2004). There must be sufficient evidence to connect the alleged accomplice to the criminal offense as a "blameworthy participant." *Cocke*, 201 S.W.3d at 748. "Mere presence at a crime scene does not make an individual an accomplice, nor is an individual an accomplice merely because he has knowledge about a crime and fails to disclose that knowledge." *Id.*

A witness may be an accomplice either as a matter of law or as a matter of fact. An individual is an accomplice as a matter of law if he could be prosecuted for the same offense with which the defendant is charged or with a lesser-included offense of that charge. *Druery*, 225 S.W.3d at 498. If a trial court determines that a witness is an accomplice as a matter of law, the court is required to provide an accomplice-witness instruction to the jury. *Cocke*, 201 S.W.3d at 748. Where the evidence suggests that a witness is an accomplice but does not clearly show that the witness is an

11

accomplice as a matter of law, the question of accomplice status is properly left to the jury with an instruction defining the term "accomplice." *Id.* at 747–48.

We begin with the question of whether a jury could rationally find that S.M. was not an accomplice as a matter of fact.[3] With regard to S.M.'s accomplice status, we treat Aguilar's claim as a challenge to the sufficiency of the jury's implied finding that S.M. was not an accomplice. *See Korell v. State*, 253 S.W.3d 405, 412 (Tex. App.—Austin 2008, pet. ref'd). Accordingly, we must review all the relevant evidence in the light most favorable to the verdict and assume the trier of fact resolved conflicts in the testimony, weighed the evidence, and drew reasonable inferences in a manner supporting the verdict. *Jackson v. Virginia*, 443 U.S. 307, 318–19 (1979).

According to Aguilar, S.M. was an accomplice because in giving Cardenas her phone, she committed an act in furtherance of the assault on Robles with the requisite culpable mental state. The State counters that, because there was no testimony indicating that S.M. knew of Cardenas's plan to locate Robles for Aguilar, there was no evidence that S.M. acted with a culpable mental state. We agree that S.M. could only have a culpable mental state in giving Cardenas the phone if she knew that it would be used to help Aguilar find and assault Robles. Consequently, the question is whether a jury could rationally conclude from the testimony presented that S.M. was unaware of any plans to harm Robles.

At trial, the jury heard Officer Ford testify that he did not consider S.M. an accomplice because she lacked a culpable mental state and was never fully aware of what was happening on the

---

[3] The evidence does not clearly demonstrate, nor does Aguilar argue, that S.M. is an accomplice as a matter of law. Thus, her status as an accomplice was properly submitted to the jury as a question of fact. *See Kunkle v. State*, 771 S.W.2d 435, 439 (Tex. Crim. App. 1986).

12

night in question.  In addition, there was no indication from S.M.'s own testimony that she realized before giving Cardenas her phone that Cardenas intended to inform Aguilar of Robles's location. Regarding the moment Cardenas asked for the phone, S.M. testified as follows:

> STATE: What happened next?
>
> S.M.: I thought me and [Cardenas] were just going for a drive.  And she started driving, like, around the neighborhoods and stuff.  And she—we drove by some houses and there was two guys outside.  And she asked to use my phone . . . .  And it wouldn't call [Aguilar's] number, because I thought it was a long distance number or something.  So she texted them.  And I guess she ended up showing [Aguilar] and [M.D.] and his friend where the house was that the guys were at.  And she used my phone to text them, to call because she found them.
>
> STATE: So [Cardenas] drove you around the neighborhood, the different neighborhoods?
>
> S.M.: Yes, ma'am.
>
> STATE: And at some point she used your—asked to use your phone?
>
> S.M.: Yes, ma'am.

Viewing this testimony in the light most favorable to the verdict, we conclude that the jury could reasonably have inferred that S.M. was unaware of why Cardenas wanted to use her phone.

Likewise, Cardenas never testified that S.M. knew of Cardenas's intent before handing over the phone.  Her cross-examination by the defense included this exchange:

> DEFENSE: At what point did you go decide to find Joe Robles?
>
> CARDENAS: I would say after I went around the block a couple of times.
>
> DEFENSE: Okay.  Was [S.M.] aware of your intent to look for Joe Robles?

13

CARDENAS: I was not actually looking for him, but no she was not.

DEFENSE: But at some point you just testified you did decide to look for Joe Robles, correct?

CARDENAS: Yes.

DEFENSE: Did [S.M.] become aware of your intent to look for Joe Robles?

CARDENAS: No, not until we passed by his house.

DEFENSE: So the answer is: Yes, at the point you passed by his house, she became aware of your intention to find Joe Robles, correct?

CARDENAS: I would still say no, because we just passed by and I seen him. She didn't—she didn't know, just like I didn't know. It was just something that happened.

This testimony does not establish that S.M. understood before giving Cardenas her phone that Cardenas intended to locate Robles for Aguilar. Accordingly, nothing in Cardenas's testimony would prevent a rational jury from concluding that S.M. lacked a culpable mental state.

Where an instruction on an accomplice as a matter of fact is raised by the evidence, a jury may decide that a witness was not in fact an accomplice. *See Gallardo v. State*, 281 S.W.3d 462, 471 (Tex. App.—San Antonio 2007, no pet.) (citing *Solomon*, 49 S.W.3d at 362). Furthermore, as an appellate court, we must afford almost complete deference to a fact finder's decision when it is based upon an evaluation of credibility. *Lancon v. State*, 253 S.W.3d 699, 705 (Tex. Crim. App. 2008). In light of the testimony from the police officer, S.M., and Cardenas, as well as the surrounding circumstances, we find that a jury could rationally have found S.M. to be a non-accomplice.

Having reached this conclusion, we need not determine the accomplice status of Wilkins and M.D. as a matter of law or fact, because, as we conclude below, their testimony is

14

sufficiently corroborated in any event. *See Herron v. State*, 86 S.W.3d 621, 632 (Tex. Crim. App. 2002) ("[N]on-accomplice evidence can render harmless a failure to submit an accomplice witness instruction by fulfilling the purpose an accomplice witness instruction is designed to serve."); *see also* Tex. R. App. P. 47.1 (court of appeals must hand down opinions that are as brief as possible while addressing those issues necessary to final disposition of appeal).

**Sufficiency of Corroborating Evidence**

Given that a jury could rationally have considered S.M. a non-accomplice, and assuming without deciding that M.D. and Wilkins were accomplices, it was appropriate for the jury to consider whether the testimony of S.M., the law enforcement officers, victim Joe Robles, and Aguilar himself (collectively, "the non-accomplice evidence") corroborated the accomplice-witness testimony presented at trial. When reviewing the sufficiency of corroborating evidence under Article 38.14, we decide whether a rational jury could have determined that the non-accomplice evidence tends to connect the accused with the commission of the crime. *Smith*, 332 S.W.3d at 442; *see Cathey*, 992 S.W.2d at 462 (noting that requirement of Article 38.14 is fulfilled if non-accomplice evidence tends to connect defendant to the offense). We hold that the combined weight of the non-accomplice evidence tends to connect Aguilar to the shooting of Robles.

In this case, the non-accomplice evidence includes the following:

1.  According to Aguilar and S.M., Aguilar was in the company of Virginia Cardenas, whom the jury was instructed was an accomplice as a matter of law, earlier in the same evening as the shooting.

2.  As Robles and Aguilar testified, there was an altercation between Robles and Cardenas outside Cardenas's home. Immediately afterward, according to S.M., Aguilar called a friend to ask him to "load something" and come over.

15

3.      According to S.M., Aguilar left with his friend and M.D. in a truck. Cardenas drove around with S.M., ultimately borrowing S.M.'s cell phone to tell Aguilar that she was "where the house was that the guys were at." Cardenas drove off after a truck pulled up that S.M. believed was carrying Aguilar.

4.      Later that evening, S.M. saw Aguilar with an injured lip at Wilkins's house. Cardenas and Wilkins were present there as well.

5.      Police officers stated that Robles was later found severely injured, apparently by shotgun pellets, and a man at the scene directed the officers to Cardenas's home.

6.      The officers who met M.D., S.M., and Cardenas at her home testified that their stories seemed less than truthful and did not add up.

7.      Also according to the officers, further questioning of S.M. led police to Wilkins's home, where a pickup truck arrived that they felt resembled the one described as involved in the shooting.

8.      According to the forensic experts, there was blood found inside the truck's door that DNA testing revealed to match a blood sample from Aguilar.

This non-accomplice evidence suggests that Aguilar had a motive to harm Robles in retaliation for his altercation with Cardenas. While motive evidence is insufficient on its own to corroborate accomplice-witness testimony, it may be considered in connection with other evidence that tends to connect the accused to the crime. *Smith*, 332 S.W.3d at 442. In addition, the non-accomplice evidence demonstrates that Aguilar was near the scene of the shooting or, at the very least, in the company of accomplices to the shooting shortly before and after it was committed. Proof that the accused was at or near the scene of the crime around the time of its commission, coupled with other circumstances such as the accused being present with an accomplice shortly before the commission of the offense, may furnish sufficient corroboration to support a conviction. *Brown v. State*, 672 S.W.2d 487, 489 (Tex. Crim. App. 1984).

16

Finally, the non-accomplice evidence indicates that there were other suspicious circumstances relating to Aguilar. For instance, after Aguilar asked his friend to "load something" and come over, the victim was assaulted with a loaded shotgun. Likewise, after Aguilar injured his lip on the night in question, his blood was found inside a truck at the home of Wilkins, whom police were investigating for a shooting involving a truck. Suspicious circumstances, in combination with evidence that the accused was present with an accomplice or had a motive to commit the offense, may be used to corroborate accomplice-witness testimony. *See Smith*, 332 S.W.3d at 442; *Cherb v. State*, 472 S.W.2d 273, 280 (Tex. Crim. App. 1971) (non-accomplice evidence of defendant carrying and counting large bag of coins, in addition to being with accomplice near time of burglary, was sufficient corroboration). These circumstances, together with the evidence of Aguilar's motive and the fact that he was with accomplices near the time of the offense, all point to Aguilar as the perpetrator in this case. Consequently, giving proper deference to the jury's resolution of the facts, we conclude that the non-accomplice testimony of S.M., Robles, the police officers, the forensic experts, and Aguilar himself more than tends to connect Aguilar with the crime of shooting Robles.

Because a jury could rationally find that the above non-accomplice evidence tends to connect Aguilar to the shooting of Joe Robles, there is sufficient corroboration of the accomplice testimony in this case. We overrule Aguilar's sole issue on appeal.

### CONCLUSION

Because the accomplice-witness testimony against Aguilar is sufficiently corroborated under Article 38.14 of the Texas Code of Criminal Procedure, we affirm the judgment of conviction.

17

_____

Diane M. Henson, Justice

Before Chief Justice Jones, Justices Pemberton and Henson

Affirmed

Filed:   February 17, 2012

Do Not Publish