**Affirmed and Opinion Filed April 2, 2015**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

**No. 05-13-01138-CR**

**No. 05-13-01139-CR**

**KENNETH PAUL LAWRENCE, Appellant**
**V.**
**THE STATE OF TEXAS, Appellee**

**On Appeal from the 380th Judicial District Court**
**Collin County, Texas**
**Trial Court Cause Nos. 380-80745-2011, 380-80746-2011**

## MEMORANDUM OPINION

Before Justices Francis, Lang-Miers, and Whitehill
Opinion by Justice Whitehill

A jury found Kenneth Paul Lawrence guilty of money laundering and engaging in organized criminal activity for his role in soliciting investors for a biodiesel project in Hunt County, Texas. In four issues on appeal, Lawrence contends that (i) the evidence is insufficient to support his convictions, (ii) the non-accomplice evidence does not connect him to the offenses, (iii) the trial court erred in allowing testimony from the State Securities Board supervisor who is a lawyer, and (iv) his Sixth Amendment right to confront witnesses was violated because he was not present for some witnesses depositions.[1] The State asks that we

---

[1] Lawrence asserts these four issues in separate briefs for each of the two convictions. We address both convictions in this opinion and refer to the issues collectively to include the points raised in both briefs.

reform the judgment in cause number 05-13-01138 (engaging in organized criminal activity) to reflect that the sentence was suspended rather than executed. We conclude that the evidence is sufficient to support the convictions and the non-accomplice testimony tends to connect Lawrence to the offenses. Lawrence's remaining issues were not preserved for our review. We reform the judgment for engaging in organized criminal activity and affirm the trial court's judgments as reformed.

## I. BACKGROUND

This case involves money laundering and engaging in organized criminal activity by soliciting funds from investors, many of whom were elderly and living on a fixed income, to construct a biodiesel plant in Hunt County, Texas. According to the indictments, the offenses were committed in Collin County between August 1, 2008 and September 30, 2009.

Lawrence, along with Ricky Knowles, John Riddle, Casey Vanloon, and Gene Nichols, solicited over $846,000 from twenty-one investors. The investors were promised high returns, and some were told they were purchasing an annuity rather than an ownership interest in a biodiesel plant. The investors were also told that the investment was "protected" by insurance. The plant was never built and the investors ultimately lost their money. Knowles, Riddle, Vanloon, and Nichols collectively received $481,168.83 of the investor funds. Lawrence's company received $266,079.76 of investor funds, of which only $40,000 was applied to the biodiesel plant.

Lawrence was charged with theft, engaging in organized criminal activity, money laundering, and securities fraud. Knowles, Riddle, and Vanloon each signed a voluntary confession and plea agreement, confessing to engaging in organized criminal activity by participating with each other and Nichols to commit money laundering and theft over $200,000.

Knowles, Riddle, and Vanloon each testified at Lawrence's trial.[2] The jury found Lawrence guilty of money laundering and engaging in organized criminal activity, and acquitted him of theft and securities fraud. The jury assessed Lawrence's sentence at five years' imprisonment for money laundering and a ten year probated sentence for engaging in organized criminal activity.

**Lawrence Energy's Biodiesel Project.**

The evidence admitted at trial established that in 2003, Lawrence and Knowles worked for the same company selling unregistered oil and gas securities. The State Securities Board investigated Lawrence for selling unregistered oil and gas securities, and Lawrence agreed to stop. Lawrence filed bankruptcy in 2004.

Knowles later started his own company, Knowles Consulting. Lawrence also started a company with his brother-in-law. Lawrence's company, L&C Consultants ("LCC"), sold interests in oil wells, some of which were dry, abandoned wells that had been drilled years before. In 2007, three investors won a judgment against Lawrence for selling unregistered oil and gas securities. Lawrence left LCC and started a new company, Lawrence Energy.

At Lawrence Energy, Lawrence began working with Sunx Energy to build a biodiesel plant in Hunt County, Texas (the "Sunx Project"). To this end, in the summer of 2008, Lawrence sent Sunx $20,000 through Lawrence Energy. Lawrence was also raising money for other projects, including a project to build a carbonization plant through a company called "Green Diversion."[3]

In the interim, Knowles Consulting was investigated by the State Securities Board, and was also the subject of a lawsuit by investors who claimed they never received a return on their investment. Knowles began looking for other work.

---

[2] Nichols pled guilty and received an eight-year sentence, but the record does not reflect the specific crime he was charged with having committed.

[3] Lawrence was a managing member of Green Diversion. Green Diversion was a sewer-waste and cow-manure carbonization company.

**The Greenway Fronting Group**.

Lawrence knew that Knowles was looking for other work. Although he was aware that Knowles had been investigated for selling unregistered securities, he suggested that Knowles sell the Sunx Project to investors. Lawrence also told Knowles that the project materials were prepared and the project would produce "somewhat of an instant income." Lawrence told Knowles "he wanted x amount of dollars back." Knowles did not recall the total, but believed Lawrence wanted "eight hundred and something thousand dollars" for the Sunx Project. Consequently, Knowles and his friend Riddle formed Greenway Energy Partners to be the Sunx Project fund-raising arm. The plan was for investor money to go to Greenway and then to Lawrence Energy. Once Lawrence Energy had the money, Lawrence was supposed to send it to Sunx. The investors were not told about Lawrence Energy or Lawrence, but were instead led to believe that Greenway would provide the money directly to Sunx. Greenway was not registered to sell securities.

Vanloon also raised money for the Sunx Project through Greenway. Vanloon, a friend of Knowles, previously worked at an insurance agency where he and his friend Nichols sold annuities. But Vanloon surrendered his insurance license after the Texas Board of Insurance investigated the company's practice of moving investors to new annuities each year to generate more commissions for the insurance agents.

When Greenway was formed, Knowles did not want his name associated with the company because of the prior securities investigation. Riddle, who worked with Knowles during the securities investigation, did not want his name associated with Greenway either. So Knowles contacted Vanloon, and Vanloon agreed to be Greenway's owner. When Vanloon joined Greenway, he also brought along his friend Nichols. Thus, Knowles, Riddle, Vanloon, and Nichols began selling the Sunx Project through Greenway.

Riddle ran Greenway's day-to-day operations and wrote all of its checks. When Greenway first started, it shared an office suite with Lawrence. Although Greenway's office eventually moved across the hall, Riddle still spoke with Lawrence on a daily basis.

Lawrence gave Greenway all of the materials it needed to sell the Sunx Project to investors, including a prospectus with information about Sunx that was readily available on the internet. The prospectus did not mention Lawrence or Lawrence Energy.

Lawrence also gave Greenway a copy of an existing joint venture agreement between Lawrence Energy and a company called Green Diesel, and told Riddle to change the name "Lawrence Energy" to "Greenway." The new joint venture agreement was to be provided to investors in the Sunx Project, but it did not mention Sunx, Lawrence, or Lawrence Energy.

**Selling the Sunx Project**.

Although the cost to own and operate a Sunx biodiesel plant was $750,000, the Greenway joint venture agreement says that Greenway was attempting to raise $3,294,000 by selling thirty joint venture units at $109,800 per unit. Investors were solicited from cold call lists Lawrence and Knowles had from their oil and gas dealings as well as from the list of clients to whom Nichols and Vanloon previously sold annuities.

Knowles testified that Lawrence told him the investors would receive an 80-100% return on their investment. But according to Knowles, "the real appealing part" was the insurance policy Lawrence told him about. Investors were told the project was backed by a Fireman's Fund-issued insurance policy that would guarantee a 33% return on investment if the plant shut down or stopped production. Many of the investors received a letter from Greenway (the "Greenway Letter") that stated:

> In regards to the Bio-Diesel Plant that Greenway Energy Partners is building in Hunt County, Texas, your investment is backed by an Insurance Policy (Firemen's Fund), provided by SunX Energy to Greenway Energy Partners. Greenway Energy Partners has extended this

policy to all of it [sic] clients. What this means to you, is that you can expect to receive a 33% return each year. This is the amount that the insurance policy will cover for the next five years.

Greenway solicited and collected funds from investors from August 2008 through August 2009. Lawrence's uncle, however, testified that by the end of 2008 Lawrence was frustrated with Sunx and having serious concerns about the investment's profitability. Nonetheless, toward the end of Greenway's operations in 2009, Lawrence still approached Vanloon and asked him whether there were any other investors Vanloon could "go see or talk to." Lawrence said they were only fifty to sixty thousand dollars away from starting the plant. Vanloon found an additional investor, but weeks passed and Vanloon heard nothing about the plant getting started.

Greenway eventually stopped functioning because the salesmen ran out of potential investors to call. Although Greenway received $846,421.60 in investor funds, the biodiesel plant was never built and the investors lost all of their money.

**The Investors.**

Four of the twenty-one individuals who invested in the Sunx Project testified by deposition at trial. These individuals included James Willis, Herman Peace, Billie Nevill, and Alma Sparks. Another investor, Garland Downing, testified live.

**Willis**

Willis, who was seventy-eight years old when deposed, testified that Nichols sold him the interest in the Sunx Project. But Willis was led to believe that Greenway was an annuity company, and he was just rolling his existing annuity into a new one. Three months before he did so, Nichols visited him to discuss investing in biodiesel. Willis told him "without any doubt whatsoever [he] wanted nothing to do with anything like that."

Willis invested over $151,000 in what he believed was an annuity. Nichols told him, "It's insured. We're looking at no risk on this." When Willis made the investment, Nichols visited his

home with another man and told Willis to sign the contract that would be "sent in" with his check. Nichols told Willis he would bring him a copy of the contract later.

The "contract" Willis and other investors eventually received was the Greenway joint venture agreement. Willis also received the Greenway Letter stating that he would receive a minimum annual return of 13.5% guaranteed for the next five years.

Willis became suspicious and began calling Greenway. He recorded telephone conversations with Nichols and Riddle, as well as a telephone conversation he had with Lawrence. The recorded conversation with Lawrence was admitted into evidence and played for the jury.

In the recorded conversation, Willis told Lawrence that he (Willis) had been deceived. He thought he was investing in another annuity, and did not want anything to do with investing in biodiesel. Willis explained that such an investment was too risky for him because of his age and health problems. Throughout the conversation, Lawrence attempted to convince Willis that the Sunx Project was a good investment. At one point, Lawrence told Willis, "[t]he interest–payout is astronomical." Lawrence also told Willis, "There are very few people privileged to own this. You don't appreciate what you own. I've got people banging on my door to get this that can't get it." When Willis asked about the guarantee that he would not lose money that Nichols told him about, Lawrence responded:

> There's no guarantee in anything. But what he's probably referring to is that once the plant is up and running, okay, Sunx has a [sic] insurance policy that they're going to put in place, now it's not in place yet, okay, because the plants aren't up and running, but there's an insurance policy for when if a plant, let's say for instance we don't get our shipment of oil one day, then our plants aren't running that day, well, our insurance will kick in and still pay us as if we were still running our plant. That's the only thing I can guess that he was referring to.

When Willis asked about a refund, Lawrence initially told him the funds had been sent to him, not Sunx. Willis asked, "Who are you?" Lawrence replied that he was the plant operator

–7–

and Greenway was to pay him for the plant. Lawrence stated, "Once I get it, all funds are distributed to Sunx. We don't hold on to the funds." When Willis insisted he should get a refund because he had been deceived, Lawrence told him, "I know these guys, they are straightforward guys. They are not crooks, they are not bad guys." Later in the conversation, Lawrence said, "They are straightforward men and I chose to do business with them because of that."

Willis continued to press for a refund, and Lawrence told him he would have to take that up with Greenway. But at one point, Lawrence told Willis, "I told them if it comes down to it, I will happily put in a request for a refund from Sunx, but they will have to take a 40% loss." Willis never received a refund, and lost the entire amount of his investment.

### Nevill

When deposed, Nevill was almost eighty-three years old, was retired, and was living on social security. She had previously bought an annuity from Vanloon. But at Vanloon's request, she withdrew that money and money from her IRA to invest in Greenway. She also signed a document allowing Riddle to answer any questions concerning the liquidation of her annuity. She did not know Riddle and signed the document without reading it.

Nevill recalled Vanloon telling her something about a biodiesel plant and that she was going to double her money. Nevill stated, "He was making it sound so good." Nevill invested $15,191 in Greenway.

Although requested, she never received any information about the company she had invested in. She did, however, receive a copy of the Greenway Letter stating that her investment was backed by the Fireman's Fund insurance policy. By the time she received the letter, Nevill had "already figured [Vanloon] was just somebody that just took my money, and did whatever he wanted to with it and had a hi-ho time." Nevill asked for her money back, but Vanloon told her that was not possible because it had already been invested. Nevill lost all of her investment.

## Sparks

Sparks was eighty-seven years old and living on social security when she testified. Sparks made a $30,000 investment in Greenway. She knew Vanloon because he had sold her an annuity. She held the annuity for about a year, and then Vanloon showed up at her door one day to "sell [her] something with Greenway." Vanloon told her the investment was "protected" with insurance from Fireman's Fund that would cover the 33% interest for five years. Sparks's main selling point was the interest she was supposed to make on the investment. Sparks did not receive a copy of the Greenway joint venture agreement or the prospectus until after she had invested her money with Greenway. Sparks also received a copy of the Greenway Letter.

About a year after her investment, Sparks tried to call Vanloon but could not reach him because all of the telephone numbers he gave her were disconnected. Sparks testified that she would not have invested had she known a large portion of the money would be used to pay the Greenway salesmen's or Lawrence's personal expenses, or that it would be applied to any of Lawrence's other projects. Sparks lost her entire investment.

## Peace

Peace was one of the annuity clients Nichols persuaded to invest in Greenway. Peace was eighty-eight years old when deposed, and had just lost his wife when Nichols sold him the investment. Nichols told him that Greenway was a good investment because it was almost no risk and "it had insurance." Peace invested $30,000 from benefits he received on his wife's death. He did not receive a copy of the prospectus until about a month after he made the investment. He also received a copy of the Greenway Letter.

Peace invested in December 2008. In January 2009, he demanded his money back because he could not get any of his calls through to Greenway and "there was a Better Business

rating of 'F.'" Peace said that it "became evident that [Greenway] wasn't what it purported to be." Peace lost his entire investment.

## Downing

Garland Downing was seventy-nine years old during trial. He had previously bought an annuity from Vanloon. Vanloon later contacted him "to invest money and get more interest out of it." Downing knew he was investing in a biodiesel plant, and wrote a check to Greenway for $67,276. Vanloon told him he would make a thirteen to fifteen percent return on the investment. Downing testified he was never told about Lawrence or that investor money would be spent on Lawrence's personal expenses. Downing never received any return on his investment, nor has his money been returned.

## Sixteen Additional Investors

In addition to the Nevill, Sparks, Peace, Downing, and Willis investments, State's exhibit seventeen shows sixteen additional investors who provided Greenway with investment funds ranging from $3,000 to $137,000. There is no indication that these funds were ever used for the Sunx Project or returned to any of the investors.

**The Greenway Investigation.**

In April 2009, the State Securities Board sent Greenway a letter asking for information about the investments. Lawrence gave Riddle a letter prepared by a lawyer on another occasion and suggested that Riddle use the letter to form a response. The Greenway response dated May 13, 2009, signed by Vanloon, stated that Greenway was not offering or selling securities "such that its business would be subject to the purview of the Securities Board." The response further said that Greenway was in the process of dissolution and declined to produce the requested information.

In May 2009, the daughter of William Breedlove, a Greenway investor, contacted a Fireman's Fund fraud investigator. That investigator, Thomas Petersik, testified that the daughter had received an email from Sunx saying that Sunx had no association with Greenway and she was concerned that there was no insurance policy backing up her father's investment. Petersik testified that he found no Fireman's policies for Greenway, Sunx, Lawrence Energy, Green Diesel, or LCC. He further testified that while Fireman's did offer business interruption insurance, he was not aware of any such policy that would guarantee a return to investors every year for five years. Petersik called Vanloon, and Vanloon admitted that Greenway had no insurance policy with Fireman's.

On May 29, 2009, Petersik sent Greenway a cease and desist letter that referenced the Greenway Letter to investors and Vanloon's admission that the information in the Greenway Letter letter was false. Petersik's letter told Vanloon, as a Greenway principal and managing partner, to "cease and desist from any representations that Fireman's . . . has any association through insurance coverage or otherwise with Greenway . . . or its business operations."

Despite the warnings and investigations, Greenway continued to solicit and receive investments through August 2009.

**The Accounting.**

Eliza Lujan, a State Securities Board enforcement division examiner, testified about her examination of Greenway's and Lawrence Energy's bank records. Greenway's account received $846,421.60 in investor funds. Of that amount, Riddle received $174,611, Knowles received $168,700, Vanloon received $81,628.60, Nichols received $56,229.23 and $266,079.76 went to Lawrence Energy.[4]

---

[4] The remaining $99,173 was attributed to various line items, some of which appear to be business expenses such as rent, and other items that are not explained such as "Jessica Vanloon People." Some $7,000 went to the Stafford Law firm to settle a lawsuit debt owed by Nichols.

The $266,079.76 Lawrence Energy received was over 31% of all investor funds. The first Greenway payment to Lawrence Energy in February 2009 was for $90,000. Of this amount, Lawrence sent $40,000 to Sunx. This was the only time he sent any of the investor funds to Sunx. The remaining $50,000 was spent on his various personal expenses, placed in a joint account with his mother, sent to a relative, and used to obtain cash.

On May 13, 2009, Greenway sent Lawrence Energy $100,000. Two days later, Lawrence sent $100,000 to Carbon Diversion.[5] None of these funds went to Sunx.

Greenway sent Lawrence Energy $50,000 on June 2, 2009 and an additional $15,000 on July 28, 2009. One week later, Lawrence wired $50,000 to Green Diversion. None of these funds went to Sunx.

Of the $846,421.60 in received investor funds, only $40,000 made it to Sunx.

**Accomplice Testimony**.

Knowles, Riddle, and Vanloon signed voluntary confessions and plea agreements, confessing to engaging in organized criminal activity by participating with each other and Nichols to commit money laundering and theft over $200,000. Knowles, Riddle, and Vanloon each testified at trial.

**Knowles**

In addition to providing background information on his previous relationship with Lawrence and Greenway's formation, Knowles testified that all of the information concerning the Sunx Project, including the insurance policy, came from Lawrence. Knowles sold the investment to only one investor, Gary Weddle. Knowles told Weddle that it was a guaranteed investment based upon the Fireman's Fund policy. Everything he told Weddle came from (i) Lawrence and (ii) the prospectus Lawrence prepared and provided. Lawrence told Knowles they

---

[5] Carbon Diversion is a Hawaiian company involved in turning yard waste and tires into carbon products.

should use the Fireman's policy to entice potential clients. Knowles admitted giving Weddle the impression that Greenway was directly involved with Sunx.

Knowles ultimately left Greenway because Lawrence kept changing the project. Initially, Lawrence said the idea was to build one biodiesel plant, then two. Eventually Lawrence said it was up to ten plants. Thus, everyone's capital would be held until there was enough money to build all of the plants.

Knowles testified that a portion of the investor money went to people at Greenway and to "pay bills." The rest went to Lawrence, who was supposed to forward the money to Sunx. Knowles had no idea whether Lawrence sent any money to Sunx. At the time, Knowles believed that Sunx was a valid company. He later learned that the company "had some problems."

**Riddle**

Riddle testified that Lawrence put the prospectus together. The joint venture agreement was sent to investors so that they could participate in the Sunx Project. When money came in to Greenway from an investor, the salesperson would get paid, a percentage would go to Greenway, and then a percentage would go to Lawrence Energy. Lawrence was then supposed to send the funds to Sunx. Lawrence told the people at Greenway that "this is the way it would work."

When the State Securities Board investigated Greenway, Lawrence gave him the form he used to prepare a response. Riddle admitted that the Greenway response said Greenway was in the process of dissolving, but there was no dissolution.

Riddle did not think that Lawrence had any contact with the investors before they invested, and he did not believe the investors knew who Lawrence was. But he did have Lawrence call Willis when Willis began to complain.

**Vanloon**

Vanloon testified that he joined Greenway when Riddle introduced him to Lawrence. When he joined Greenway, he was led to believe that Lawrence had his own customer base and would also be contacting customers. Lawrence gave Vanloon all of the information about the Fireman's Fund insurance policy that he used to solicit investors. Vanloon testified that everything was intended to be legitimate and he did not intend to commit theft or money laundering.

**Expert Testimony.**

Joseph Oman, an attorney and assistant director of the State Securities Board, testified for the State without objection. Oman was a lawyer from the same office as the three special prosecutors who tried the case, and he provided expert testimony on securities law.

## II. ANALYSIS

### A. Was the Evidence Sufficient to Support Lawrence's Convictions?

Lawrence's first issue contends that the evidence was insufficient to support his convictions for engaging in organized criminal activity and money laundering. In assessing the sufficiency of the evidence, we review all the evidence in the light most favorable to the verdict to determine whether any rational trier of fact could have found the essential elements beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). We defer to the jury's credibility and weight determinations because the jury is the sole judge of the witnesses' credibility and the weight to be given their testimony. *See Isassi v. State*, 330 S.W.3d 633, 638 (Tex. Crim. App. 2010). We may not substitute our judgment for that of the fact finder. *See Brooks v. State*, 323 S.W.3d 893, 899 (Tex. Crim. App. 2010).

**1.** *Was The Evidence Sufficient to Support Lawrence's Conviction for Engaging in Organized Criminal Activity?*

A person commits the offense of engaging in organized criminal activity if, (i) with the intent to establish, maintain, or participate in a combination or in the profits of a combination or as a member of a criminal street gang, (ii) the person commits or conspires to commit one of the crimes identified in the statute. *See* TEX. PENAL CODE ANN. §71.02(a) (West Supp. 2014); *see also Nguyen v. State*, 1 S.W.3d 694, 697 (Tex. Crim. App. 1999). The crime charged in this case was theft. *See* TEX. PENAL CODE ANN. §31.03 (West Supp. 2014).

Because direct evidence is rarely available to prove the existence of an agreement, circumstantial evidence suffices and is almost always needed. *Nwosoucha v. State*, 325 S.W.3d 816, 831 (Tex.App.—Houston [14th Dist.] 2010, pet. ref'd). The jury may therefore infer an agreement among a group working on a common project when each person's action is consistent with realizing the common goal. *Id.*

In support of his argument that he did not enter into a combination for the purpose of committing theft, Lawrence claims that one of the accomplices testified that he was not aware of the fraudulent manner the funds were acquired and there is no evidence that he "directly defrauded any investor."[6] Despite Lawrence's contentions, the evidence shows that Lawrence collaborated, in combination with Nichols, Knowles, Riddle, and Vanloon to raise money for the Sunx Project according to the plan Lawrence devised and set into motion. Lawrence also decided how the money would flow from investors to Greenway to Lawrence Energy, gave Greenway the prospectus and joint venture agreement, and let Greenway use his offices to start its operations. Furthermore, Lawrence generated the idea of using the Fireman's Fund policy as a sales pitch for potential investors. Lawrence gave Greenway a list of potential clients to contact,

---

[6] Lawrence does not identify the specific testimony or provide citations to the record.

and pressured the salesmen to find more investors. And when Riddle told him that the Securities Board was starting to look into things, Lawrence provided a form letter to lead the Securities Board to believe Greenway was dissolving.

The jury heard testimony concerning Lawrence's prior business dealings, including his difficulties with the Securities Board and the judgment entered against him in the lawsuit with former investors. The jury also heard testimony that Lawrence knew of Knowles's prior difficulties with the Securities Board, and selected him to lead the salesforce. In fact, Lawrence told Knowles the Sunx Project would provide "somewhat of an instant income."

Although Lawrence had doubts about the biodiesel plant within two to three months of his initial investment, he pressured Greenway to solicit additional investors and he continued to receive Greenway generated funds through August 2009. From March 2009 through August 2009, Greenway solicited ten more investors, and Lawrence knew that the investor money was not being applied to the Sunx Project. Instead, after the $40,000 wire transfer to Sunx in February 2009, all investor funds Lawrence Energy received were used for Lawrence's personal expenses, his relatives, and his other projects. For example, when Lawrence received $100,000 in investor funds in May 2009, he applied the funds to his carbonization project. Lawrence knew that investors should have been told about the new project because Vanloon testified Lawrence was "going to send something to let people know." Nothing was ever sent, and the investors were never told that Lawrence was using their money for numerous other purposes besides the Sunx Project.

Lawrence also points to the disclaimer language in the prospectus as evidence that he did not know of the fraud. This argument is not persuasive. Lawrence does not explain how language in the prospectus, that investors were not given until after they had invested, somehow demonstrates that he did not know about the fraud. Moreover, the prospectus's warning language

says only that "participation as a joint venture . . . involves a high degree of risk." The prospectus does not warn that Lawrence and his accomplices would appropriate investor funds for themselves.

Lawrence further contends that each accomplice denied the wrongdoing necessary to establish a "combination," and that the potential investors were given "completed mutilated versions of Lawrence's original information." But it was the jury's job to resolve any conflicts in the evidence, and the jury was free to accept or reject any and all of the evidence presented by either side. TEX. CODE CRIM. PROC. ANN. art. 38.04 (West 1979); *Wesbrook v. State*, 29 S.W.3d 103, 111 (Tex. Crim. App. 2000). Considering all the evidence in the light most favorable to the verdict, we conclude that the jury was rationally justified in finding guilt beyond a reasonable doubt and that the evidence is sufficient to support Lawrence's conviction for engaging in organized criminal activity. *See Isassi*, 330 S.W.3d at 638.

### 2. *Was The Evidence Sufficient to Support Lawrence's Conviction for Money Laundering?*

The essential elements of a money laundering offense under penal code section 34.01(a)(1) are that a person: (i) knowingly; (ii) acquire or maintain an interest in, receive, conceal, possess, transfer, or transport; (iii) the proceeds; (iv) of criminal activity. *See* TEX. PENAL CODE ANN. §34.02(a)(1) (West 2011). The Penal Code specifically provides that "criminal activity" includes any offense that is classified as a felony in Texas. TEX. PENAL CODE ANN. §34.01(1)(A) (West 2011). Here, the criminal activity was theft. *See* TEX. PENAL CODE ANN. §31.03.[7] The indictment alleged that Lawrence committed money laundering when he knowingly acquired an interest in and possessed $200,000 or more that was generated from the commission of a theft in the amount of $200,000 or more. TEX. PENAL CODE ANN. §34.02(a)(1); (e)(4).

---

[7] The theft indictment is not included in the record.

Lawrence does not dispute that over $200,000 in investor funds were sent to him or that the money was in his possession. Instead, he claims he did not know the money was obtained by theft. Sufficient evidence establishes otherwise.

The evidence shows that Lawrence knew about Knowles's prior securities investigations. Because Greenway occupied the same office building and temporarily the same office as Lawrence Energy, and because Riddle spoke with Lawrence on a daily basis, the jury could reasonably infer Lawrence knew Greenway was structured with Vanloon as the owner to keep Riddle's and Knowles's involvement from investors. Indeed, from his close proximity to and interaction with Greenway, the jury could rationally infer that Lawrence knew what Greenway and its members did regarding the Sunx Project.

Moreover, when he gave Riddle the joint venture agreement and prospectus for the Sunx Project, Lawrence told him to change "Lawrence Energy" to "Greenway." Neither document mentioned Lawrence or Lawrence Energy. Thus, Lawrence knew the investors were unaware of his involvement in the project. In fact, when Lawrence spoke to Willis after he complained about the investment, Willis had to ask Lawrence who he was.

Despite the investors' lack of knowledge about Lawrence's involvement, the record shows that he was the Sunx Project mastermind. He suggested that Riddle and Knowles solicit investors. He provided the joint venture agreement and prospectus. He told the Greenway members that money would flow from investors to Greenway, from Greenway to Lawrence Energy, and then from Lawrence Energy to Sunx. And he generated the phantom Fireman's Fund policy sales pitch that Greenway used to lure investors.

Lawrence, however, insists there is no evidence he knew that investors were being misled about the insurance policy or told the investment was guaranteed. But when Willis asked him about Nichols's representation that Willis would not lose any of his investment, Lawrence

–18–

immediately identified the Fireman's Fund policy as the likely source of Nichols's reference. The Greenway members testified that all of the information about the Sunx Project came from Lawrence, including the information about the insurance policy.

The investors testified that the alleged insurance was material to their decision to invest. For example, Peace said that he would not have invested had he known the investment was not insured. Similarly, Nevill testified she would not have "given him" her money had she known it was not protected.

The documents Lawrence prepared for Greenway were also misleading. None of the documents mention Lawrence, Lawrence Energy, or any of Lawrence's other projects. None of the documents reflect that investor funds will be utilized to pay salesman commissions, personal expenses, or to invest in other projects. In fact, the joint venture agreement states that Greenway was attempting to raise $3,294,000 by selling thirty joint venture units at $109,800 per unit. But the investors did not purchase $109,000 units, and the cost of the single biodiesel plant originally planned was $750,000. Lawrence also told Knowles $800,000 was required for the project. These inconsistencies are, at best, misleading.

Although it was after the fact, Lawrence also deceived Willis when he told him how the investor funds were allocated. When Willis requested a refund, Lawrence told him the funds were distributed to Sunx when he received them. But of the $266,079 in investor funds Lawrence Energy received, only $40,000 was sent to Sunx.

Even though Lawrence early on had doubts and concerns about the Sunx Project, he continued to collect investor funds from Greenway and encouraged the Greenway salesmen to solicit more investments. Moreover, his claimed lack of awareness that the money was stolen fails to address why he used the money as he did. Assuming *arguendo* that Lawrence was unaware of representations made to the investors concerning the insurance and returns, at a

minimum he knew the investors were told the money was for the Sunx Project and that the money was to go to Sunx. Yet only $40,000 of the funds he received were sent to Sunx while he divested substantial sums to his personal use and to the "Green Diversion" project.

Based on the foregoing, we conclude that the evidence is sufficient to allow rational jurors to determine beyond a reasonable doubt that Lawrence was guilty of money laundering. We decide Lawrence's first issue against him.

## B. Does the Non-Accomplice Evidence Connect Lawrence to the Crimes for Which he was Convicted?

Lawrence's second issue argues that the non–accomplice testimony fails to connect him to money laundering or engaging in organized criminal activity. An accomplice is a person who participates in the offense before, during, or after its commission with the requisite mental state. *Smith v. State*, 332 S.W.3d 425, 439, 442 (Tex. Crim. App. 2011) (internal citations omitted). An accomplice must have engaged in an affirmative act that promotes the commission of the offense that the accused committed. *See id.* A witness who is indicted for the same offense or a lesser included offense as the accused is an accomplice as a matter of law. *Cocke v. State*, 201 S.W.3d 744, 747 (Tex. Crim. App. 2006). Here, the court instructed the jury that Knowles, Riddle, and Vanloon were Lawrence's accomplices as a matter of law.

The code of criminal procedure provides that a conviction cannot stand on an accomplice witness's testimony unless the testimony is corroborated by non-accomplice evidence that tends to connect the accused to the offense committed. *See* TEX. CODE CRIM. PROC. ANN. art. 38.14 (West 2011). Evidence that the offense was committed is insufficient to corroborate an accomplice witness's testimony. *Id*. Regarding the appropriation of property, the theft statute provides that "the actor's knowledge or intent may be established by the uncorroborated testimony of the accomplice." *See* TEX. PENAL CODE ANN. §31.03(c)(2) (West Supp. 2014).

–20–

The accomplice–witness rule creates a statutorily imposed review and does not derive from federal or state constitutional principles that define the usual factual and legal sufficiency standards. *Druery v. State*, 225 S.W.3d 491, 498 (Tex. Crim. App. 2007). To weigh the sufficiency of the corroborative evidence, we disregard the accomplice's testimony and examine the remaining portions of the record to ascertain whether there is evidence tending to connect the accused with the commission of the crime. *Solomon v. State*, 49 S.W.3d 356, 361 (Tex. Crim. App. 2001); *Maynard v. State*, 166 S.W.3d 403, 410 (Tex. App.—Austin 2005, pet. ref'd). Thus, the question here is whether there is evidence tending to connect Lawrence with the offenses without considering the testimony of Knowles, Riddle, and Vanloon.

We review a claim that accomplice–witness testimony is insufficiently corroborated in the light most favorable to the verdict. *See Hernandez v. State*, 939 S.W.2d 173, 176 (Tex. Crim. App. 1997). Because the standard is "tendency to connect," rather than a rational-sufficiency standard, the corroborating evidence need not be sufficient by itself to establish guilt beyond a reasonable doubt. *Id.* "Circumstances that are apparently insignificant may constitute sufficient evidence of corroboration." *Malone v. State*, 253 S.W.3d 253, 257 (Tex. Crim. App. 2008). Also, "[t]here need only be some non–accomplice evidence tending to connect the defendant to the crime, not to every element of the crime." *Joubert v. State*, 235 S.W.3d 729, 731 (Tex. Crim. App. 2007). Nor is the evidence required to link the defendant directly to the crime. *Matter of C.M.G.*, 905 S.W.2d 56, 58 (Tex. App.—Austin 1995, no writ). If the combined weight of the non-accomplice evidence tends to connect the defendant to the offense, article 38.14 is fulfilled. *Cathey v. State*, 992 S.W.2d 460, 462 (Tex. Crim. App. 1999).

Ignoring the accomplice testimony, we conclude that the evidence tends to connect Lawrence to the offenses of money laundering and engaging in organized criminal activity. For example, Lawrence's telephone conversation with Willis tends to connect Lawrence to the

charged offenses. During this conversation, Lawrence discussed the Fireman's Fund policy and suggested Nichols was referring to this policy when he told Willis his investment was guaranteed. It is reasonable to infer Lawrence would not have mentioned the insurance policy in the context of a discussion about investment guarantees unless he was aware that the policy was being described to investors as a guarantee.

Although he knew otherwise, throughout his conversation with Willis, Lawrence repeatedly told Willis that the Greenway men were honest, straight forward men who had "never been in trouble." He also told Willis that the Sunx Project investment was an excellent investment that people were lining up and begging to participate in. And when Willis requested a refund, Lawrence told him the funds had gone to Sunx. Lawrence knew that these statements were false, and the statements corroborate that investors were being deceived. Furthermore, Lawrence's statements about the "astronomical interest" and the soundness of the investment comport with the investors' testimony about the high rate of return they were told to expect.

Lawrence's bank accounts also connect him to the offenses. The money trail demonstrates the flow of money from investors to Greenway to Lawrence Energy and shows collaboration with the Greenway members regarding investor funds. The bank records also show that investors were deceived because only $40,000 of investor funds Lawrence Energy received from Greenway were applied to the Sunx Project. The remaining investor funds Lawrence Energy received were diverted for Lawrence's personal use and his other projects without the investors' knowledge. In fact, Lujan, the Securities Board examiner, testified that Lawrence spent $50,000 of the first $90,000 that came to him for his own purposes. When considered without the testimony of Knowles, Riddle, and Vanloon, the non-accomplice evidence reasonably connects Lawrence to the offenses and corroborates the accomplice witness testimony. We resolve Lawrence's second issue against him.

C. **Was it Error to Allow the Expert Testimony of the Prosecutor's Supervisor?**

Lawrence's third issue asserts that the trial court erred in allowing Oman to testify as an expert witness because he is employed by the same office as the special prosecutors in this case. The essence of Lawrence's complaint is that Oman should have been disqualified under the rule of professional conduct that precludes an attorney from acting as an advocate and a witness in the same proceeding. *See* Tex. Disciplinary Rules Prof'l Conduct 3.08. The State responds that the issue has not been preserved for our review.

To preserve a complaint for appellate review, a defendant must make a timely objection to the trial court, state with sufficient specificity the grounds for the ruling sought, and obtain an adverse ruling on his objection. TEX. R. APP. P. 33.1; *Buchanan v. State*, 207 S.W.3d 772, 775 (Tex. Crim. App. 2006).

Lawrence concedes no objection was made at trial, but argues an objection was not required because the issue involves structural error. Lawrence confuses the concept of "structural error," which has to do with harm analysis, with the concept of "systemic requirements," which have to do with preservation of error. *See Mendez v. State*, 138 S.W.3d 334, 339 (Tex. Crim. App. 2004).

"A 'structural' error affect[s] the framework within which the trial proceeds, rather than simply an error in the trial process itself,'" and is not amenable to a harm analysis. *Schmutz v. State,* 440 S.W.3d 29, 35 (Tex. Crim. App. 2014) (quoting *Jordan v. State*, 256 S.W.3d 286, 290 (Tex. Crim. App. 2008). All structural errors must be founded on a violation of a federal constitutional right, but not all violations of federal constitutional rights amount to structural errors. *See United States v. Davila*, 133 S.Ct. 2139, 2149 (2013); *Arizona v. Fulminante*, 499 U.S. 279, 306–08 (1991) (noting harmless-error analysis has been applied to a wide range of [constitutional] errors and recognizing that most constitutional errors can be harmless).

In *Davila*, the court explained that structural error is a very limited class of errors that trigger an automatic reversal. These errors include denial of counsel, denial of self-representation, denial of a public trial, and the failure to convey to a jury that guilt must be proved beyond a reasonable doubt. *Id.* A structural error is not subject to a harmless error test. *Mendez*, 138 S.W.3d at 339.

On the other hand, a systemic (or absolute) requirement is "a law that a trial court has a duty to follow even if the parties wish otherwise." *See Mendez*, 138 S.W.3d at 340. Systemic requirements are not necessarily constitutional. *Id.* at 341. For example, jurisdiction, which is not constitutional, is a systemic requirement. *Id.* A systemic requirement is distinguished from a "waivable right" and a "forfeitable right." *Id.* at 340. A waivable right is a right that must be implemented by the system unless expressly waived. *Id.* A forfeitable right is a right that is to be implemented upon request. *Id.* Rule 33.1 of the rules of appellate procedure (requiring an objection in the trial court) applies to all complaints except those that involve rules that are "waivable only" or "systemic" requirements. *Mendez*, 138 S.W.3d at 342; *see also Landers v. State*, 402 S.W.3d 252, 255 (Tex. Crim. App. 2013).

With regard to structural error, Lawrence fails to explain how the rules of professional conduct rise to the level of a federal constitutional right,[8] and we note that disqualification of an attorney is not on the short list of errors that are recognized as structural. *See Davila*, 133 S.Ct. at 2149; *see also Johnson v. U.S.,* 520 U.S. 461, 468–69 (1997). There is also nothing to suggest that the rules of professional conduct are systemic requirements. Therefore, Lawrence forfeited his complaint about disqualification when he failed to raise it in the court below. *See* TEX. R. APP. P. 33.1; *Mendez*, 138 S.W.3d at 342. Lawrence's third issue is overruled.

---

[8] Although Lawrence argues that the rule "has obvious over-tones and implications with regard to the Sixth Amendment Right to Confront," Lawrence provides no authority to support the proposition that the alleged error is structural.

D. **Was Lawrence's Right to Confront Witnesses Violated?**

Lawrence's fourth issue contends he was deprived of his Sixth Amendment right to confront witnesses because he was not present for "at least two and possibly up to four" depositions of the witnesses and there is no indication that he knowingly waived his right to be present. Lawrence acknowledges that the depositions were properly ordered and applied for and that notice was given to his counsel.

The Confrontation Clause provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. CONST. amend. VI. This procedural guarantee is applicable in both federal and state prosecutions, *Pointer v. Texas,* 380 U.S. 400, 406 (1965), and bars the admission of testimonial statements of a witness who does not appear at trial unless the witness is unavailable to testify and the defendant had a prior opportunity to cross-examine him. *Crawford v. Washington*, 541 U.S. 36, 59 (2004).

A defendant always has the burden of raising a Confrontation Clause objection. *Melendez-Diaz v. Massachucetts*, 557 U.S. 305, 327 (2009). The right of confrontation is thus a right that is subject to the usual rules of procedural default. *Anderson v. State*, 301 S.W.3d 276, 280 (Tex. Crim. App. 2009). Here, Lawrence did not object to the depositions when they were introduced at trial.

Lawrence admits the record is silent as to the reasons for his failure to attend the depositions, and he seems to suggest that there must be an affirmative waiver of the right of confrontation on the record. But this court has held that the right of confrontation is a forfeitable right—not a right that must be affirmatively waived. *See Deener v. State*, 214 S.W.3d 522, 527 (Tex. App.—Dallas 2006, pet. ref'd). As a result, the right must be preserved by a timely and specific objection at trial. *Id.*

Lawrence further asserts that article 39.025(g) of the code of criminal procedure is unconstitutional. *See* TEX. CODE CRIM. PROC. ANN. art. 39.025(g). Article 39.025(g) provides that a defendant's failure to attend a deposition or request a continuance constitutes a waiver of the defendant's right to be present at the deposition. Lawrence also raises this argument for the first time on appeal. Because Lawrence failed to raise his Sixth Amendment or article 39 arguments in the trial court, the issue was not preserved for our review. *See* TEX. R. APP. P. 33.1. Lawrence's fourth issue is overruled.

**E. Reformation of the Judgment.**

The State observes that the second page of the judgment in cause number 05-13-01138-CR (engaging in organized criminal activity) improperly reflects that the sentence is executed rather than suspended, and requests that we correct the judgment. An appellate court has the power to correct and reform a judgment "to make the record speak the truth when it has the necessary data and information to do so." *Asbury v. State*, 813 S.W.2d 526, 529 (Tex. App.—Dallas 1991, pet. ref'd).

The record reflects that when the judge pronounced the sentence, the court assessed punishment at ten years' imprisonment and then stated, "[t]he imposition of the sentence is suspended and the defendant is placed on community supervision for a period of 10 years." The first page of the judgment correctly recites that the sentence of confinement was suspended. The second page does not. Because the judgment does not accurately reflect the sentence that was pronounced, we reform the judgment in cause number 05-13-01138-CR to reflect that the sentence was suspended. As reformed, we affirm the trial court's judgment.

## III. CONCLUSION

Having resolved all of Lawrence's issues against him, we reform the judgment in cause number 05-13-01138-CR to reflect that the sentence was suspended. As reformed, we affirm the trial court's judgment. The judgment in cause number 05-13-01139-CR is also affirmed.

Do Not Publish
TEX. R. APP. P. 47
131138F.U05

/Bill Whitehill/
BILL WHITEHILL
JUSTICE

–27–



## Court of Appeals
## Fifth District of Texas at Dallas
## JUDGMENT

KENNETH PAUL LAWRENCE, Appellant

No. 05-13-01138-CR      V.

THE STATE OF TEXAS, Appellee

On Appeal from the 380th Judicial District Court, Collin County, Texas
Trial Court Cause No. 380-80745-2011.
Opinion delivered by Justice Whitehill. Justices Francis and Lang-Miers participating.

Based on the Court's opinion of this date, the judgment is reformed to reflect that the sentence is suspended. As reformed, the judgment of the trial court is **AFFIRMED**.

Judgment entered April 2, 2015.



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

KENNETH PAUL LAWRENCE, Appellant

No. 05-13-01139-CR          V.

THE STATE OF TEXAS, Appellee

On Appeal from the 380th Judicial District
Court, Collin County, Texas
Trial Court Cause No. 380-80746-2011.
Opinion delivered by Justice Whitehill.
Justices Francis and Lang-Miers
participating.

Based on the Court's opinion of this date, the judgment of the trial court is **AFFIRMED**.

Judgment entered April 2, 2015.